IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHNNIE BUTLER,

  *Petitioner*,

  v.

UNITED STATES OF AMERICA,

  *Respondent*.

Criminal No. ELH-08-381
(Related Case: Civil Action
No. ELH-12-3468)

**MEMORANDUM OPINION**

On January 29, 2010, a federal jury convicted petitioner Johnnie Butler of conspiracy to distribute one kilogram or more of heroin and conspiracy to distribute cocaine (Count One); possession of a firearm in furtherance of that conspiracy (Count Three); and possession of a firearm after having been convicted of a felony (Count Four).  Verdict, ECF 382.  Butler was found not guilty of Count Two, which charged possession and discharge of a firearm on October 20, 2007, causing the death of Fernando Rodriguez, in furtherance of a drug-trafficking crime, *i.e.*, conspiracy to distribute controlled substances.  *Id.*[1]  Butler was sentenced to life imprisonment.  Judgment, ECF 423 (Legg, J., presiding).[2]  His conviction and sentence were upheld on appeal.  *United States v. Butler & Wright*, 429 F. App'x 239 (4th Cir.), *cert. denied*, 132 S. Ct. 762 (2011).

Butler was represented at trial and on appeal, but is now self-represented.  He has filed a "Motion to Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody," pursuant

---

[1] As discussed below, Butler's defense was that the murder was committed by a coconspirator, without Butler's presence or knowledge.  *See*, *e.g.*, Sentencing Transcript at 39-41, ECF 482.

[2] The case was initially assigned to Judge Andre M. Davis.  In April 2009, it was reassigned to Judge Benson Legg, who presided at the trial of Butler and a codefendant, Calvin Wright.  The case was reassigned to me in August 2012, because of Judge Legg's impending retirement.

to 28 U.S.C. § 2255 ("Motion" or "§ 2255 Motion," ECF 564).  The Motion is supported, *inter alia*, by a memorandum of law ("Memo," ECF 564-1); Butler's Affidavit (Exhibit E, ECF 564-6); and other exhibits.[3]  Butler asks the Court to vacate his judgment and sentence, or for "[a]ny other relief that this … Court deems just and appropriate in this case."  Memo at 51, ECF 564-1 at 54.[4]  He has also requested an evidentiary hearing and asks the Court to "appoint counsel to assist [him] with the litigation of his § 2255 motion before this Court[.]"  *Id.* at 50.

Butler has also submitted other motions.  In particular, he has filed a "Motion for Discovery Pursuant to Rule (6)" ("Discovery Motion," ECF 569); a "Motion Bringing To The Attention Of The Court Recent, Dispositive Precedent In Support Of His Motion To Vacate Under 28 U.S.C. § 2255" (ECF 582); and a "Motion For Permission To Amend And Amendment To Section 2255" (ECF 585); (ECF 582 and ECF 585 shall be referred to collectively as "Supplemental Motions").

The government opposes the Motion and has submitted several exhibits in support of its position.  *See* Government's Response to Petitioner's Motion to Vacate, Set Aside, or Correct Sentence, "Opposition," ECF 575, and attached exhibits.  The Opposition is supported in part by an affidavit submitted by Butler's trial and appellate counsel, Thomas J. Saunders.  *See* Saunders Aff., ECF 575-8.  Butler has filed a reply.  Reply, ECF 581.  The government has not filed a response to Butler's Discovery Motion or his Supplemental Motions.

---

[3]  Because Butler is proceeding without counsel, his filings have been "liberally construed" and are "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotations omitted).

[4]  Petitioner may not have easy access to the federal Public Access to Court Electronic Records (PACER) system.  Therefore, I will cite to Butler's pagination in his Memo, because the electronic pagination does not always correspond to page numbers as they appear on the filings. For the convenience of other readers, as to other documents, I will cite to the electronic page numbers, using the court's CM/ECF system.

With respect to Butler's § 2255 Motion, Butler has organized his claims into four "grounds" for relief: prosecutorial misconduct, abuse of discretion by the trial court, fourth amendment violations, and ineffective assistance of counsel.  ECF 564-1 at 1, 7, 11, 17.  In all, Butler alleges seventeen different bases to challenge his conviction and one to challenge his sentence.  *See generally* Memo.  Most of Butler's claims concern the government's use of information obtained in 2002 from a confidential source ("CS-1"); the use of GPS trackers on certain vehicles; the grand jury testimony of Rafael Rodriguez, the brother of the decedent; and Butler's dissatisfaction with the performance of his appointed trial and appellate attorney.

The Motion has been fully briefed.  Section 2255(b) requires a hearing, "[u]nless the motion and the files and records conclusively show that the prisoner is entitled to no relief … ."  *See, e.g.*, *United States v. O'Quinn*, 166 F. App'x 697, 698 (4th Cir. 2006) ("Unless it is clear from the record, as expanded, that the prisoner is not entitled to relief, § 2255 makes an evidentiary hearing mandatory.");  *United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004) (holding that the record is unclear regarding alleged promises made by the government to the petitioner, and therefore an evidentiary hearing on the question must be held).  No hearing is necessary at this time.  But, as discussed below, a hearing may be necessary as to limited issues.

For the reasons that follow, I will deny the Motion except insofar as it claims that Butler suffered ineffective assistance of counsel at the plea-negotiations stage.  As to those claims, I will seek to expand the record, and will defer ruling on the merits until such time as the record is certain and/or amplified.  I will deny Butler's request for counsel as to those issues that are ripe for disposition, but I will defer ruling on Butler's request for counsel as to any remaining matters.  I will accept the Supplemental Motions as amendments to the § 2255 Motion, but I will deny the claims and the relief requested therein.  I will also deny the Discovery Motion.

### Factual and Procedural Background

Butler first came to the attention of local and federal law enforcement in 2002.  *See* Aff. in Support of Application for Wiretap dated June 3, 2008, at 14-15 ("Wiretap Affidavit,"  ECF 222-1, Ex. 1 to Government's Consolidated Opposition to Pretrial Motions) ("Consolidated Opposition," ECF 222).   According to the government, in 2002 the Baltimore City Police Department and the local office of the federal Drug Enforcement Administration began "receiving information involving a heroin organization [known as 'Red-Dot'] that operates throughout the Baltimore metropolitan area."  *Id*.   Some of this information came from an informant identified in the Wiretap Affidavit as "Confidential Source #1," or "CS-1."  *Id*. at 15.  Specifically, in 2002 CS-1 obtained a cellular phone number belonging to someone known as "Jr.," who the government believed to be Butler.   *Id*.   CS-1 told the government "that 'Jr.' obtains unknown amounts of heroin and cocaine from the New York area then distributes the heroin and cocaine in Baltimore at wholesale prices," *id*., and identified a vehicle "Jr." often drove.  *Id*. at 16.

About four years later, Butler was arrested and appeared in federal court on drug trafficking charges.  *See* Docket, Criminal Action No. CCB-06-00057 (D. Md.) (conspiracy to possess with intent to distribute heroin and possession with intent to distribute heroin).   The charges were dismissed after Butler successfully suppressed evidence obtained in violation of the Fourth Amendment.  *See* Memo at 2; Crim. No. CCB-06-00057, ECF 25 (Butler motion to suppress); ECF 39 (granting motion); ECF 49 (order dated July 2006 dismissing indictment).

Approximately one year later, law enforcement was back on Butler's trail with the help of a cooperator inside Butler's organization, referred to in the Wiretap Affidavit as "Confidential Source #2," or "CS-2."  Wiretap Aff. at 16.  According to the government, in "April, 2008, CS-2

stated … that Jr. (later identified as B[utler]) was a large heroin trafficker in the Baltimore area that was obtaining multiple kilograms of heroin." *Id.* at 16-17.   Between then and June 2008, law enforcement worked to corroborate CS-2 statement's "through other DEA investigations, controlled purchases, telephone records, consensual recordings, surveillance, the execution of search warrants, the seizure of large amounts of US currency and interviews with CS-1 and [another confidential source of information]." *Id.* at 16; *see also id.* at 17-21 (describing in detail law enforcements' corroboration work).   CS-2 also provided a new phone number believed to belong to Butler. *Id.* at 18.   Based on this information, on June 3, 2008, the Circuit Court for Baltimore County authorized the first wiretap in this case, to monitor Butler's phone.   ECF 222, Consol. Opp. at 2.

Although the wiretap was authorized pursuant to Maryland State law, the relevant State statute has identical language to the federal wiretap statute, 18 U.S.C. § 2518 *et seq.* (commonly referred to as "Title III") regarding exhaustion of other investigative means. *Compare* 18 U.S.C. § 2518(c) (stating an order must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous") *with* Md. Code (2006 Repl. Vol., 2008 Supp.), § 10-408(a)(1)(iii) of the Courts & Judicial Proceedings Article ("C.J.") (same).[5] Accordingly, the Wiretap Affidavit included a section asserting that "normal investigative procedures have been tried and failed … ."   Wiretap Aff. at 45.   Under this heading, the government described its use of "Bumper Beepers," that is, GPS tracking devices, on cars belonging to Butler and his coconspirator Calvin Wright. *Id.* at 52.   It concluded that although the devices had "been useful in tracking vehicles," this information did not aid the investigation

---

[5] I have cited to the portion of the Maryland Code in effect at or about the relevant time. This portion of the statute is now found in the 2013 Replacement Volume.   Any changes are not material.

for a number of reasons.  *Id.* at 53.  Notably, because many coconspirators shared vehicles and changed vehicles frequently, "there [was] no means [for the government] to ascertain who [was] actually operating [a given vehicle] at the given time."  *Id.*

Between June 2008 and September 2008, the government expanded its investigation of the conspiracy.  It used information gleaned from the first wiretap to obtain wiretaps on six other phone lines, *see* Consol. Opp. at 3-6, and to obtain search warrants for more than a dozen residences and vehicles associated with the conspiracy.  *See id.* at 8-9; Memo at 16 (alleging search "of at least 20 different residences").

On August 12, 2008, a federal grand jury indicted Butler, Wright, and eight others on one count of conspiracy to distribute 100 grams or more of heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).  Indictment, ECF 1.  On September 11, 2008, law enforcement "arrested Butler and Wright, and executed a series of search and seizure warrants on several residences associated with the organization."  ECF 390, Memorandum of Mar. 24, 2010 (Legg, J.), at 2 ("Post-Verdict Opinion").  As Judge Legg stated in denying post-trial motions: "These searches recovered numerous tools of the drug trade, including cellular telephones, SIM cards, and numerous jugs for distributing heroine in quantities suitable for individual consumption." *Id.*  He added: "Officers also recovered an SKS assault rifle from a green Dodge minivan in which Butler and Wright had previously been observed."  *Id.*

Soon after the indictment was unsealed on September 12, 2008, Thomas Saunders entered his appearance as attorney for Butler.  ECF 31 (Saunders appearance).  Butler states in his Affidavit that he first saw Saunders in September 2008 and "instructed him [then] that [he] wanted a speedy trial … and advised him to get [Butler's] case together for trial at the earliest."

Butler Aff. ¶ 4.  Butler adds that "Saunders did agree with [Butler's] approach and said he would pursue [Butler's] wishes accordingly." *Id.*

The last remaining defendant was brought into federal custody and had his initial appearance on October 17, 2008.  ECF 113 (docket entry); *see also* ECF 128, Government's Motion To Exclude Time Pursuant To The Speedy Trial Act at 1 ("Speedy Trial Motion").

On December 15, 2008, the trial court granted the government's unopposed Speedy Trial Motion, effective through January 11, 2010, pursuant to 18 U.S.C. § 3161(h)(7).  ("Clock Order," ECF 129).  The Clock Order listed five reasons as to why "the ends of justice served by [a] … delay in the trial of this case outweigh[ed] the interests of the public and the defendants in a speedy trial … ."  ECF 129 at 1.  It included a finding that "the failure to set trial beyond the speedy trial date in this proceeding would deny counsel for the defendants … the reasonable time necessary for effective preparation," in light of the complexity of the case.  *See* Clock Order at 2; *see also* 18 U.S.C. §§ 3161(h)(7).

In his Affidavit, Saunders explains that he believed "[t]his particular case was far too complicated to be tried within seventy days of indictment," and that he "accepted the postponements for the advantage of preparation and in the interest of [his] client's case."  ECF 575-8, Saunders Aff. at 3.  Butler contends that he only learned of the Clock Order after its approval, sometime before August 2009.  *See* Butler Aff. ¶¶ 5, 9 (quoted below).

Butler alleges that between September 2008 and August 2009, Saunders repeatedly advised him to cooperate with the government and to plead guilty "or face the death penalty."  For example, Butler avers, ECF 564-6 (Butler Affidavit):

4.  … I initially [saw] Saunders in September of 2008 … ;

5.  … [I]t was months later when … he told me that he waived my speedy trial rights and wanted me to cooperate with law enforcement in the case.  I

became frustrated and upset with counsel for going against my specific wishes and trying to have me be an informant. … Counsel advised that I should cooperate and plead guilty or face the death penalty on charges that he said were coming against me; …

7.   … [A]ttorney Saunders paid visits to my Grandmother, sister and family essentially trying to scare them into believing that I was going to get the death penalty if I did not cooperate and plead guilty in the case;

8.   ... Saunder[s] again visited me at jail and again attempted to talk me into cooperating and pleading guilty or I was going to face the death penalty for the murder of Fernando Rodriguez and Sintia Mesa. …

Butler Aff. ¶¶ 4, 5, 7, 8.

Further, Butler alleges that he was "very disappointed with counsel's actions," and seems to suggest that Saunders refused to discuss a plea deal on the conspiracy charge with the government unless it involved cooperation.  He states in his Affidavit, ¶¶ 6, 8:

6.   … [T]he meeting referenced in ¶ 5 above ended on a bad note and we parted ways with me being very disappointed with counsel's actions; …

8.   … Saunders never did explain any terms of [a] plea deal only that I had to cooperate and testify and plead guilty in my federal case.  I told Saunders that I was not guilty of killing anyone and could not cooperate, but would possibly plead guilty to the drug charges.  Attorney Saunder[s] stated that that was unacceptable even though he did not — to my knowledge — confer with the AUSA during our conversation.  (emphasis added).

In response to Butler's allegations, Saunders states, *inter alia*, that "the government made it clear and Mr. Butler was so advised that nothing less than a life imprisonment plea was possible without cooperation."  ECF 575-8, Saunders Aff. at 1.  "And as Mr. Butler sets out," he continues, "cooperation was not something he was willing to consider," so "counsel had no room to negotiate any plea bargain absent cooperation."  *Id.*[6]

---

[6] As discussed, *infra*, the government has not submitted any evidence corroborating Saunders's claim that it refused to enter a plea deal for Butler without cooperation.  *See generally* Opposition and exhibits, ECF 575, 575-1 through 575-12.  In its Opposition, the government relies on Saunders's affidavit for the proposition that Saunders provided effective assistance of counsel.  Opposition at 11-12, ECF 575.

Meanwhile, several of Butler's codefendants filed motions to suppress tangible and derivative evidence, statements, and the wiretap evidence.  ECF 141, 148, 152, 154, 181, 187, 206.  All of these were short, boilerplate motions.  *See*, *e.g.*, ECF 141 at 1 (contending that "insufficient probable cause existed for initial authorization" of the wiretap, without further detail).  On March 31, 2009, Butler joined those motions.  ECF 215.

Between January 2009 and August 2009, six of the other nine defendants pled guilty to the drug conspiracy or lesser charges.  ECF 136, 158, 164, 166, 199, 237.  Moreover, "additional witnesses … c[a]me forward with information about Mr. Butler and his associates."  *See* Status Report from Government dated Mar. 2, 2009, ECF 189.  It also appears that during this time Butler and Wright were charged in state court with the murder of a woman named Sintia Mesa. *See* Application for Statement of Charges dated June 2009, ECF 405-6 (sealed).

In August 2009, Butler, Wright, and the third remaining defendant[7] were charged in a Superseding Indictment ("First Superseding Indictment," ECF 252), which modified the conspiracy charge and added three additional counts.  The conspiracy charge in Count One was expanded to allege conspiracy to distribute "one kilogram or more" of heroin, rather than 100 grams, and a quantity of cocaine as well as additional overt acts.  *Id*. at 3.  One of these acts was Butler's alleged murder of Fernando Rodriguez, "who had been Butler's source of supply for heroin and cocaine."  *Id*. at 3-4.  Count Two charged Butler with possession and discharge of a firearm, causing the death of Rodriguez, in furtherance of a drug-trafficking crime, *i.e.,* conspiracy to distribute, in violation of 18 U.S.C. § 942(c)(1)(A)(iii).  *Id*. at 5.  The parties frequently refer to this count as "the murder charge."  Count Three charged Butler and Wright with possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C.

_____

[7] At this time, one other defendant charged in the initial indictment had not yet pleaded guilty, but he was not charged in the superseding indictment.  All charges were eventually dismissed against this defendant.  ECF 434.

§ 942(c)(1)(A)(i).   Count Four charged them with possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).

Butler alleges that Fernando Rodriguez's brother, Rafael Rodriguez, testified before the grand jury, presumably when it was considering this First Superseding Indictment, and that Rodriguez perjured himself.  He states, Memo at 4:

> [D]uring the movant[']s trial it was discovered that … Raf[ae]l Rodriguez['s] (R.R.) … testimony used to obtain a superseding indictment … from 100(g) to 1000(g) of drugs … was based upon perjured testimony!  R.R. testified that he was the supplier of the movant from 2005 until 2006, when in fact he wasn't!  R.R. testified at the movant[']s trial that 'he did not know the movant in 2005['] (See Exhibit A).  Further, movant was in federal custody in 2006, making it physically impossible for him to be supplied drugs via R.R..

The evidence submitted by Butler in support of this contention indicates that the misleading statements were proffered by Rodriguez at a March 2009 meeting with his attorney and the government.  *See* Ex. A to Memo., Trial Transcript, Cross-Examination of R. Rodriguez at 16, 20, ECF 564-2 at 2, 6 ("Rodriguez Cross").  Although it appears that Rafael Rodriguez testified before the grand jury in relation to this case, *see* Saunders Letter dated Aug. 18, 2010, ECF 498, I cannot tell from the record or briefings whether the same statements proffered at the March 2009 meeting were also presented to the grand jury.  *See* Opposition at 8, ECF 575 (referencing "the supposed false testimony in the grand jury," without further explanation).

In late October 2009, after the return of the First Superseding Indictment and about two weeks before the hearing on suppression motions, Butler sent a letter to the trial judge asking for the appointment of new counsel.  Butler Letter, received Oct. 28, 2009, ECF 279; Memorandum to Counsel dated Nov. 5, 2009, ECF 283 (stating hearing dates).   In his letter, Butler "respectfully request[ed] to be appointed new counsel … due to the fact" that Saunders "failed to inform" Butler of five "issues," which he then outlined.  *Id*.  Two of these related to the Speedy

Trial Act: Butler asserted that Saunders "waived [his] right to Speedy trial with out [sic] [his] consent or knowledge." *Id*. Butler was also upset that Saunders had simply joined in another defendant's motion to suppress, rather than submit his own, because this led Butler "to believe [Saunders] did no research or work of his own." *Id*. Finally, Butler complained that Saunders had "failed to inform" him about two doctrines of law that Butler seems to have believed held some hope for relief. *Id*. (stating lack of information about "5th Amendment right … from being in jeopardy only for offensive charge" and "Amended Petition," "[t]he substantive revision to an indictment that [is] inadmissible even where the defendant consent[s] … .").

Shortly thereafter, on November 3, 2009, Saunders filed supplemental memoranda, one "In Support of [the] Motion to Suppress Evidence from Title III Wiretap" ("Wiretap Motion," ECF 280), and one "In Support of [the] Motion to Suppress Search and Seizure Evidence" ("Search Motion," ECF 281). In the challenge to the wiretap evidence, Saunders contended that the evidence gathered via the wiretap should be suppressed because the government failed to show that other, "ordinary means of investigation would not result in success." Wiretap Motion at 4-5, ECF 280; *see also id*. at 5 ("According to the Government's own affidavit they had not encountered difficulties gathering evidence, but had been remarkably successful. Nothing in the set of facts as set out justified the use of wiretaps given the statutory preference for less intrusive techniques.") (internal quotations omitted). The Search Motion urged suppression of all evidence obtained from the search of various residences and vehicles, claiming the evidence was the fruit of the poisonous tree, in light of the fact that the warrants were procured based on evidence obtained from the allegedly illegal wiretaps. Search Motion at 1, ECF 281.

Judge Legg held a teleconference about Butler's concerns the next day, November 4, 2009. However, he did not appoint new counsel. Memo to Counsel dated Nov. 5, 2009, ECF 283. In his memo to counsel, Judge Legg did not specify the reasons for his decision.

Two weeks later, on November 15, 2009, Butler submitted directly to the court a motion to dismiss that he had prepared without Saunders's aid. *See* Pro Se Motion to Dismiss, ECF 292 ("Pro Se Motion"); Butler Aff., ECF 564-6, at ¶ 14. He argued that the case should be dismissed because it was not brought within seventy days from his initial appearance, in violation of the Speedy Trial Act, and reiterated his concerns with Saunders as counsel. Pro Se Motion at 1-6. He also argued the case should be dismissed for two reasons related to the indictment, *id.* at 6-7, and because the government had "no physical evidence to suggest that Mr. Butler was involved in a cocaine conspiracy." *Id.* at 8. Judge Legg refused to consider the motion because it was prepared by a non-lawyer and not filed or adopted by Butler's attorney. Order, ECF 295.

As noted, the trial court held a motions hearing on November 18, 2009. On November 24, 2009, Judge Legg denied all of the motions to suppress. *See* ECF 302 (addressing ECF 185, 186, 187, 280, 281, and 282).

A Second Superseding Indictment was filed the day after the hearing, on November 19, 2009. ECF 300. A Third Superseding Indictment, ECF 303, was filed on December 10, 2009. The Fourth Superseding Indictment was filed on December 31, 2009, ECF 321, adding a new count against Wright for drug possession. Five days later, on January 5, 2010, Butler pled not guilty to the charges in the Fourth Superseding Indictment.

Trial began on January 5, 2010, ECF 336, and lasted twelve days. *See* ECF 373. At trial, Butler claimed that the murder was not committed by Butler, but instead by Walter Horton, without Butler's presence or knowledge. *See*, *e.g.*, Trial Transcript, ECF 474 at 36 (Saunders's

opening argument); Trial Transcript, ECF 477 at 132-144 (Saunders's cross-examination of Walter Horton); *see also* Sentencing Transcript at 39-41, ECF 482 (Saunders's argument against application of the murder cross-reference).

In their joint appellate brief, counsel for Butler and Wright summarized the evidence at trial, as follows, ECF 575-6 at 6, "Appellants' Brief":

> Several conspirators testified that Butler and Wright provided them with heroin and cocaine to sell on the street. (*E.g.* JA 126, 256.) They would provide codefendants with 'testers' to distribute to drug users for free as well as pre-packaged heroin to sell on the street. (JA 137, 257, 432-33.) The heroin was packaged in a distinctive way: in glass jugs with black tops. (JA 139, 311, 431, 540.) Butler and Wright provided coconspirators with several hundred grams of the controlled substances at a time. (*E.g.* JA 129-30, 257.)

> Recorded telephone calls between Butler and Wright and the cooperating codefendants tended to involve obscure references to what they were doing. Various codefendants, however, interpreted the tape recordings from the witness stand and explained that they were talking about selling controlled substances. (JA 77-79, 150-51, 259-266.) The codefendants anticipated receiving great personal benefit from their testimony. (*E.g.* JA 125, 254, 429, 586.) And codefendants also testified to using controlled substances themselves. (*E.g.* JA 122, 580.)

> Several codefendants testified to seeing Butler and Wright driving a green minivan. (JA 313, 969.) In addition, people who worked for or with Butler and Wright also frequently drove the van. (JA 969.) No codefendant testified to ever seeing a firearm in the green van. (*E.g.* JA 362, 970.) The government seized the minivan, in which they found two firearms. (JA 1420-22.) When the government seized the minivan, Butler and Wright had already been arrested at other locations. The firearms inside the minivan formed the basis for charges of possessing a firearm in furtherance of a drug trafficking crime and possessing a firearm after having been convicted of a felony in Counts 3 and 4. (JA 58-59.)

> The government also charged Butler with possessing and discharging a firearm, causing the death of Fernando Rodriguez, someone who supplied Butler with heroin and cocaine, in furtherance of the drug conspiracy. (JA 57.) In support of this charge, the government presented evidence of a codefendant, Walter Horton, who testified that he witnessed the shooting. (JA 960.) The government also offered evidence that the decedent's DNA was present in several places in the kitchen of Butler's house. (*E.g.* JA 1367-72.) The government offered evidence that Rodriguez had supplied Butler and Wright with multiple kilograms of heroin and cocaine, that they owed him tens of thousands of dollars,

and that Rodriguez had played a trick on Butler and Wright by supplying them with fake drugs.  (*E.g.* JA 654, 660, 662-63, 668, 707, 743-50.) …

In its appellate brief, the government provided the following summary, in relevant part,

Gov't. Brief, Appellate Docket No. 10-4499, ECF 54 at 3-10:

> Antoine Boston, Geraldmain Wilkerson, Akeem Yarberough, Daron Ashe, Davon Ashe, and Walter Horton received heroin from Johnnie Butler and Calvin Wright in 2008.  JA 432-33,980-82.  The heroin was packaged in black-top glass jugs.  JA 975.  Boston and Wilkerson had been receiving heroin from Butler for a period of years, commencing as early as 2001.  JA 126, 256.  Boston, Wilkerson, Daron Ashe, and Davon Ashe were street sellers.  JA 980-82.  Butler was involved in their day-to-day activities, suggesting new locations for drug shops and monitoring the progress of sales.  JA 142-43, 261.  Recorded conversations between Johnnie Butler or Calvin Wright and cooperating witnesses contain references, some of which were explicit, to drug dealing (e.g., JA 143).  (footnote omitted). …

> At the conclusion of the wiretap investigation, on September 11, 2008, agents searched a green minivan which was driven by various members of the Butler organization.  JA 1421.  Two weapons were located inside the vehicle, including an SKS assault rifle.  JA 1421-22.  …

> Fernando Rodriguez supplied drugs to the Butler organization.  JA 949-50. At trial, Rafael Rodriguez, Fernando's Rodriguez's [sic] brother, testified that he knew Butler as "Jay."  JA 650.  Additionally, Rafael Rodriguez testified that Butler had threatened the life of Fernando Rodriguez for having supplied him with fake drugs.  JA 664-67.

> At Butler's sentencing hearing, Alba Rodriguez, the widow of Fernando Rodriguez, testified regarding a conversation she overheard before Fernando Rodriguez left her home for the last time.  JA 2059-60.  Ms. Rodriguez testified that Fernando Rodriguez received a call from an individual named "Jay."  JA 2060.  After receiving the call, Fernando Rodriguez told his wife that he had to leave.  JA 2060.

> Jose Castillo testified at trial that, on October 20, 2007, he and Fernando Rodriguez took a trip to Maryland to 'see someone or pick something up.'  JA 800, 809.  Castillo testified that Fernando Rodriguez left him at a shopping center. The shopping center was within three miles of 707 MacDill Road.  JA 831-32.

> Walter Horton testified at trial that, on the day Fernando Rodriguez was killed, he arrived at 707 MacDill Road and observed Fernando Rodriguez (whom he knew as Georgie) sitting by the counter in the kitchen.  JA 948, 959.  Horton testified that Butler was leaving the front door and walking toward Horton and

Georgie.  JA 960.  Horton further testified that he was removing items from a bag when he heard a gunshot, looked up, and saw Butler with a gun in his hand, smoking a blunt.  JA 961.  Horton stated that Georgie fell to the floor, and Butler walked to the front door to see if anyone heard the shot.  JA 962.  Butler then instructed Wright to clean it up and Wright turned the body over.  JA 963.  Horton also testified that he was told by Wright that Butler owed Georgie $20,000 and that was why Butler killed Georgie.  JA 957-58.[8]

Belynda Jo Poe, who lived in the area of 706 MacDill Road, testified that she saw Butler and Wright at 707 MacDill Road daily until the weekend of October 20, 2007.  JA 1160-61.  Ms. Poe further testified that on that weekend, a Hispanic or Puerto Rican family was showing a photo and looking for a gentleman at 707 MacDill.  JA 1162.

Detective Vernon Parker testified that his investigation into the murder of Fernando Rodriguez hit a roadblock until he spoke to Walter Horton.  JA 901-02.  Detective Parker testified that, as a result of information provided by Horton, he obtained a second search and seizure warrant for 707 MacDill Road.  JA 901-02.  Detective Parker testified that, upon execution of the second search and seizure warrant, he directed the collection of items from the kitchen which were submitted for DNA comparison against the known standard of Fernando Rodriguez.  JA 907-10.

Criminalist Kevin Beardsley testified that he swabbed moulding from the refrigerator, a piece of carpet, the carpet edging strip, linoleum from the kitchen floor, and a wood panel from the kitchen island, and packaged those items for DNA.  JA 1329-35.  Mr. Beardsley further testified that he packaged fingernail clippings of Fernando Rodriguez for DNA.  JA 1336.  Kelly Miller, a DNA analyst with the Baltimore Police Department Crime Lab, was accepted as an expert in DNA forensic investigation.  JA 1356.  Ms. Miller explained that the sample from the carpet edging strip contained DNA that was consistent with a mixture of Fernando Rodriguez, Johnnie Butler, and an unknown source.  JA 1371.

Dr. Ling, the medical examiner, testified that she observed two gunshot wounds to the body of Fernando Rodriguez.  JA 1237.  Dr. Li testified that Fernando Rodriguez had an entrance wound from a gunshot on the back of his head and an exit wound on the front.  JA 1238-39.  She further testified that there was another gunshot wound to the front of Rodriguez's left forearm.  JA 1239.

As noted, the jury found Butler guilty of Count One (conspiracy to distribute one kilogram or more of heroin and conspiracy to distribute cocaine); Count Three (possession of a firearm in furtherance of a drug trafficking crime); and Count Four (possession of a firearm after

---

[8] *See also* Testimony of Walter Horton, Trial Transcript, ECF 477 at 86-89.

having been convicted of a felony).   Verdict, ECF 382 at 1-2, 3.   It found Butler not guilty of Count Two.   Despite the content of Count Two in the Fourth Superseding Indictment, the verdict sheet merely asked the jury to determine whether or not Butler was guilty of "Possessing a firearm on October 20, 2007 in furtherance of the crime of conspiracy to distribute a controlled substance charged in Count One" or "Discharging a firearm in furtherance of the crime of conspiracy … ."   The verdict sheet did not specifically mention the alleged murder victim, Fernando Rodriguez.  *Id*. at 3.

In connection with the defendants' post-verdict motions for judgment of acquittal, under Fed. R. Crim. P. 29, ECF 390, Judge Legg said:   "[T]he evidence established that Butler and Wright operated a complex, lucrative drug conspiracy."   Post-Verdict Opinion at 2, ECF 390.

In regard to sentencing, the government claimed that Butler's base offense level under the federal Sentencing Guidelines for the drug conspiracy conviction was a 36, and asked the court to apply an upward adjustment under U.S.S.G. § 2D1.1(d)(1), commonly referred to as the "murder cross-reference," for the murder of Fernando Rodriguez, as well as an upward adjustment under U.S.S.G. § 3B1.1(a), for Butler's leadership role in the conspiracy.   Sentencing Memo at 4, 6, ECF 405 (sealed).   If only the latter were applied, Butler's base offense level would have been 40.  *Id*. at 5.   If the cross-reference applied, Butler's base offense would have been 43.   Because of Butler's prior criminal record — which placed him in criminal history category of VI, *id*. at 13 — the advisory sentencing guidelines range for each of these base levels (36, 40, 43) was 324-405 months, 360-life, and life, respectively.  *See id*. at 13.

Saunders submitted two letters to the court, objecting to the application of the two increases.   ECF 411, ECF 411-1.   He argued that "the Government's facts regarding the murder of Mr. Rodriguez were not established at trial," ECF 411 at 2, and that "absent a finding by the

trial judge that the Government has established that the murder was committed by Mr. Butler, no cross-reference can be made." ECF 411-1. Saunders also argued for a two-level increase under U.S.S.G. § 3B1.1(a), rather than the four-level increase the government requested. ECF 411-1. He admitted that the government's case showed that Butler directed two individuals in connection with a wholesale drug operation, but asserted that Butler "provided no management or control of the various retailers who distributed the drugs." *Id.*

Judge Legg conducted Butler's sentencing on April 29, 2010. *See* Sentencing Transcript, ECF 482 (also appearing as an exhibit to the Opposition to this Motion at 575-5). At the hearing, the government presented further evidence as to the murder of Rodriguez. It called Alba Rodriguez, the wife of the murder victim; her hearsay testimony was not allowed at trial. Sentencing Transcript, ECF 482 at 5, 10. As the government put it, Ms. Rodriguez provided the "missing link" between the murder and Butler. *Id.* at 6. Ms. Rodriguez testified that, days before her husband went missing, she overheard him take a call from a man he referred to as Jay, that he disappeared into the bathroom while he was on the call, and that when he emerged he said he had to leave, even though he was supposed to stay where he was for another four days. *Id.* at 10-11.

The government also pointed out that, even if the court accepted Butler's arguments at trial that one of his coconspirators actually committed the murder, "that really doesn't get Mr. Butler out of trouble here," because "there is no basis for which [the coconspirator] would have had to do it or would have done it, other than in furtherance of Mr. Butler's conspiracy." *Id.* at 30. It presented two additional witnesses, one regarding the Rodriguez murder, *id.* at 14-17, and one about Butler's actions in an attempted murder of police officers, to which he pled guilty years before. *Id.* at 19-25, 52. In closing, it requested a life sentence for Butler, "with or without

the murder cross-reference." *Id.* at 49.   Referring to Butler's "history of violence," *id.*, the prosecutor added that, even if the court "ultimately holds that it's an offense level of 40, which is 360 [months] to life, it would still be our recommendation that a life sentence is appropriate." *Id.*

Saunders did not present evidence, but argued against both increases.   Regarding the leadership enhancement, Saunders reiterated what he saw as a distinction between wholesale and retail operations.   *Id.* at 37-38 ("So my argument is that, at most, the government has shown that Mr. Butler worked with two individuals … .   And so, therefore, a four and level [sic] increase would be improper.").   Regarding the murder cross-reference, he repeated Butler's defense at trial, that is, that the murder was committed independently by a coconspirator.   *Id.* at 39-42. Saunders also told the court that Butler had been raised "without the guidance of parents" and "in a situation where the drug world was constantly always around him."   *Id.* at 52.   Butler did not speak; Saunders noted that Butler maintained his innocence on all counts.   *Id.* at 50.

Judge Legg applied both increases and sentenced Butler to life imprisonment.   *Id.* at 53, 57, 59.   Judge Legg stated that the "increase for role" was "relatively uncomplicated."   *Id.* at 53. He found it "clear … that the Butler organization included at least five individuals."   *Id.*   As to the murder, he noted that the "standard for a sentencing is … the preponderance of the evidence standard," not the reasonable-doubt required at trial.   *Id.* 54.   Nonetheless, he found "that there is clear and convincing evidence that either Mr. Butler himself murdered Rodriguez, or that the murder was committed by someone else in the Butler organization and therefore the murder should be attributed to Mr. Butler."   *Id.*   The judge found it "highly unlikely that Mr. Butler would have forgiven [the coconspirator who Butler blamed] entirely — for [an] action which was [supposedly] against Mr. Butler's wishes."   *Id.* at 56.

Butler (and Wright) noted an appeal to the United States Court of Appeals for the Fourth Circuit.  *See* Appellants' Brief, ECF 575-6.  Saunders represented Butler on appeal.  *See id.*  In the appellate brief, counsel argued, *inter alia*, that the trial court erred in sentencing Butler to life, challenging Judge Legg's application of both increases.  *Id*. at 12-15.  In an unpublished opinion, the Fourth Circuit upheld Judge Legg's decisions, finding sufficient evidence in the record for both increases.  *Butler & Wright*, *supra*, 429 F. App'x at 241.

During the appeal, Butler filed a number of documents directly with the Fourth Circuit. On July 5, 2010, he asked the Court for "an extension of time to file a pro-se supplemental brief," explaining that "[s]ince [his] arrival at USP McCreary" he "had no contact with [his] attorney, and therefore" did "not know if there was a briefing schedule set by the Court. Appellate Docket No. 10-4499, ECF 19.  He expressed concern about procedural default.  *Id*. Butler filed his own "Motion for Summary Reversal" (Appellate Docket, ECF 29) before Saunders filed an appellate brief.  *See* Appellate Docket, ECF 38.  Butler's motion reiterated his belief that his speedy trial rights had been violated.  *See generally* Appellate Docket, ECF 29. After counsel filed a joint Appellants' Brief for Butler and Wright, Butler filed a pro se motion to strike the brief.  He stated that he had instructed Saunders to appeal three issues — Judge Legg's "fail[ure] to inquire as to the contents of a letter [he] wrote him complaining about Mr. Saunders"; the "Title III Wire Tap Suppression hearing"; and the government's "knowin[g]" presentation of perjured material to the grand jury.  Appellate Docket, ECF 50 at 1.  He included as an exhibit a letter from Saunders, in which Saunders "acknowledge[d]" that Butler asked him to brief these issues, but explained why he believed they lacked merit and did not brief them.  *Id*. at 5.  Butler asked the Court to strike Saunders's brief and permit Butler to file his own brief, or to strike Saunders's brief and to appoint new counsel.  *Id*. at 2.  The Court denied Butler's

motion to strike, but permitted Butler to file a supplemental pro se brief.  Appellate Docket, ECF 53.  In its opinion, the Fourth Circuit denied Butler's motion for reversal, without discussion. ECF 508-2 at 5; *see also* Appellate Docket, ECF 63 at 5.  The mandate issued on July 6, 2011. ECF 524.

On the same day that the Fourth Circuit denied Butler's appeal, Saunders filed a motion to withdraw as Butler's attorney.  Appellate Docket, ECF 65-1.  He stated that Butler had already advised him that he "would seek further review of this case if [the] Court affirmed his conviction and sentence," but that he (Saunders) believed a petition for writ of certiorari would be "frivolous."  *Id.*  The Court granted Saunders's motion, as well as a pro se motion from Butler for leave to file a pro se petition for rehearing and rehearing en banc.  Appellate Docket, ECF 80. Butler belatedly filed a "Pro Se Supplemental Brief," arguing the same things he had "instructed" Saunders to brief, as well as a speedy trial violation, Appellate Docket, ECF 73, which the Court did not address.  *See generally* Appellate Docket.  Butler filed a petition for rehearing, Appellate Docket, ECF 77, which the Court denied.  Appellate Docket, ECF 83. Butler then filed a petition for writ of certiorari, Appellate Docket, ECF 85, which the Supreme Court denied.  Appellate Docket, ECF 86; 132 S. Ct. 762 (2011).

Butler filed the Motion and Discovery Motion at issue here in 2012, within one year after his unsuccessful appeal.  ECF 564-1, 569.  Butler filed the Supplemental Motions in 2014.  ECF 582, 585.  Butler also repeatedly corresponded with Judge Legg between July 2010 and April 2012 regarding access to certain documents in the government's possession.  *See* ECF 490, 531, 542.  Notably, Butler requested complete copies of the grand jury transcripts.  *E.g.*, ECF 490. Saunders stated in two letters to Judge Legg that the government would not permit Butler to have complete copies, but that Saunders was permitted to read Rodriguez's testimony to Butler, and

that this did not satisfy Mr. Butler.  *See* ECF 498, 501.  Judge Legg returned a letter to Butler

stating, in part: "[Y]ou must understand that, for security reasons, you are not entitled to review

the entire file." ECF 530.  In apparent response to Judge Legg's letter, Butler then accused

Saunders of "mak[ing] deals with the AUSA not to give [him] access to [his] discovery material

before trial, during trial, or afterwards." Butler Letter dated September 14, 2011, ECF 531.

### Standard of Review

Pursuant to 28 U.S.C. § 2255(a), a prisoner in federal custody may "move the court

which imposed the sentence to vacate, set aside or correct the sentence" if the prisoner can show

"that the sentence was imposed in violation of the Constitution or laws of the United States, or

that the court was without jurisdiction to impose such sentence, or that the sentence was in

excess of the maximum authorized by law, or is otherwise subject to collateral attack … ." The

Fourth Circuit has said that a district court has "three possible methods, depending upon the

facts, [for] disposition of motions under Section 2255": summary disposition, disposition on an

expanded record, and disposition after an evidentiary hearing. *Raines v. United States*, 423 F.2d

526, 530 (4th Cir. 1970).

Summary disposition is appropriate where "the files and records conclusively show that

the prisoner is entitled to no relief." *Id*.; *accord United States v. Dyess*, 730 F.3d 354, 359 (4th

Cir. 2013) (holding that "vague and conclusory allegations contained in a § 2255 petition may be

disposed of without further investigation by the district court"); *see also* Rule 4(b) of the Rules

Governing Section 2255 Proceedings [hereinafter, "§ 2255 Rules"] ("If it plainly appears from

the motion, any attached exhibits, and the record of prior proceedings that the moving party is

not entitled to relief, the judge must dismiss the motion … ."). "When [a] district court denies §

2255 relief without an evidentiary hearing, the nature of the court's ruling is akin to ruling on a motion for summary judgment." *United States v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2007).

Where the record is not conclusive, "there is a permissible intermediate step that may avoid the necessity for an expensive and time consuming evidentiary hearing." *Id.* The court may "proceed by requiring that the record be expanded … ." *Id.*; *accord United States v. Pender*, 514 F. App'x 359, 361 (4th Cir. 2013) (vacating "the district court's order and remand[ing] so that the district court can either hold a hearing or otherwise further develop the record before ruling"); *see also* Rule 7 of § 2255 Rules ("If the motion is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the motion."). The § 2255 Rules permit the court to require the authentication of any new materials submitted to the court. Rule 7(a) of the § 2255 Rules. "[M]aterials that may be required include letters predating the filing of the motion, documents, exhibits, and answers under oath to written interrogatories propounded by the judge." Rule 7(b) of § 2255 Rules.

Even if a court seeks to expand the record, "[t]here will [always] remain … a category of petitions, usually involving credibility, that will require an evidentiary hearing in open court." *Raines*, 423 F.2d at 430. Section 2255(b) mandates hearings for petitions brought thereunder, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief … ." Because "resolution on the basis of affidavits can rarely be conclusive" when "the issue is one of credibility," *Raines*, 423 F.2d at 430, a hearing is generally "required when a movant presents a colorable Sixth Amendment claim showing disputed material facts and a credibility determination is necessary to resolve the issue." *United States v. Robertson*, 219 F. App'x. 286, 286 (4th Cir. 2007); s*ee also United States v. Lopez*, No. 13-7953, 2014 WL 1688671, at *1 (4th Cir. Apr. 30, 2014) (remanding where appellant claimed "district court erred

by crediting trial counsel's affidavit over his claims," without holding a hearing or permitting appellant to swear to his own claims); *United States v. Ray*, 547 F. App'x 343, 345 (4th Cir. 2013) ("An evidentiary hearing in open court is required when a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record or when a credibility determination is necessary in order to resolve the issue.") (citing *United States v. Witherspoon*, 231 F.3d 923, 926-27 (4th Cir. 2000)).

### Discussion

In his Motion, Butler lodges seventeen challenges to his conviction, and one challenge to his sentence. *See generally* Memo, ECF 564-1. As stated above, Butler has organized his claims into four grounds with many sub-parts. Several of his claims are overlapping if not repetitive. In addressing Butler's concerns, I will adhere to Butler's subdivision of claims. However, for clarity, I have assigned a number to each claim, as follows.

Under "Ground One: Prosecutorial Misconduct," Butler challenges the government's use of (1) information obtained in 2002 in its 2008 Wiretap Affidavit, (2) warrantless GPS devices on cars, and (3) Rafael Rodriguez's grand jury testimony, Memo at 2-5, and asserts that (4) the prosecutor engaged in misconduct, generally referenced in a paragraph containing a laundry list of allegations. *Id*. at 6-7.

Under "Ground Two: Abuse of Discretion," Butler claims that the trial court (5) should have *sua sponte* rejected or suppressed evidence obtained in 2002 or via GPS use, as well as the Rodriguez testimony, and that (6) the court's failure to appoint new counsel for Butler was an abuse of discretion. *Id*. at 7-11.

In "Ground Three: Fourth Amendment Violations," Butler claims that (7) the government's warrantless use of GPS violated the Fourth Amendment. *Id*. at 14-17.

Under "Ground Four: Ineffective Assistance of Counsel," Butler claims Saunders was ineffective (8) at the plea-bargaining stage, *id* at 18-20; (9) in waiving Butler's right to a speedy trial, *id*. at 21-25; (10) in regard to motions to suppress evidence, *id*. at 26-29; (11) in failing to bring to the trial court's attention a "complete breakdown in attorney/client relations," *id*. at 29-34; (12) in failing to properly explain the Sentencing Guidelines, *id*. at 34-38; (13) in failing to fully investigate the facts, *id*. at 38-41; (14) in his cross-examination of three witnesses at trial, *id*. at 41-44; (15) in failing to preserve for appeal the court's ruling denying re-cross of a cooperating witness, *id*. at 44-45; (16) in "essentially abandoning" Butler during the sentencing proceedings, *id*. at 45-47; (17) in failing to appeal Judge Legg's denial of Butler's suppression motions; and (18) in failing to appeal Judge Legg's denial of Butler's request for new counsel. *Id*. at 47-48.

In his Supplemental Motions, Butler adds two claims.  In ECF 582 at 3, Butler argues that he "is entitled to re-sentencing without the mandatory life sentence enhancement, because the jury never found Butler guilty … of this alleged conduct," *i.e.*, the murder of Rodriguez.  He cites *Alleyne v. United States*, --- U.S. ---, 133 S. Ct. 2151 (2013), for this contention.  *Id*.  In ECF 585, Butler argues that his conviction should be vacated because "the Federal Stored Communications Act (SCA) is unconstitutional," according to a case recently decided by the United State Court of Appeals for the Eleventh Circuit.  ECF 585 at 1.  He cites *United States v. Davis*, 2014 WL 162244, No. 12-12982, (11th Cir. June 11, 2014).  *Id*.

The government maintains that all of the claims under grounds One through Three cannot be raised in the Motion because they were not raised on appeal.  ECF 575, Opposition at 8-11 (arguing procedural default).  It maintains that "merely 'couching' an argument as ineffective assistance does not make the argument so."  *Id*. at 10.

Butler contends that "no waivers apply to this case" because "[t]he Movant … has consist[e]ntly asserted his due process rights through-out the criminal proceedings." ECF 564-1 at 2, Memo at II.  Moreover, he argues that "there are no procedural default arguments" because "[a]ll of [his] grounds for § 2255 relief are couched in Sixth Amendment allegations of ineffective assistance of counsel." *Id.*

I interpret Butler's first argument to be that he believes he has never waived these claims because he raised them himself at trial or on appeal.  And, I interpret Butler's second argument to be that, because he raised these issues himself, the actions of his "ineffective" counsel should not be counted against him.

The record shows Butler personally raised some of the claims now stated under grounds One, Two, and Three when his trial and appellate proceedings were underway.  *See, e.g.*, ECF 279, Butler Letter, received Oct. 28, 2009 (requesting new counsel; alleging Speedy Trial Act violations); Appellate Docket, No. 10-4499, ECF 19, Butler letter, filed July 12, 2010 (requesting extension of time to file pro se brief on appeal because "[t]here are issues that … must be raised on direct appeal or they will be considered abandoned and I will be procedurally barred from raising the[m] at some later time"); ECF 490, Butler Letter, received July 28, 2010 (requesting discovery related to Rodriguez testimony).

Although Butler presents several ineffective assistance of counsel claims in the subsection titled "Ground Four," the claims in grounds One, Two, and Three are separately stated as independent grounds, with the note, as stated above, that they are all "couched" as ineffective assistance of counsel claims.  Because petitioner is proceeding without counsel, I will "liberally construe" his argument to be that Saunders was ineffective in failing to raise on appeal each of the claims contained under grounds One, Two, and Three.  *See Erickson v. Pardus*, 551

U.S. 89, 94 (2007); *accord Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 1294 (2014).   All of Butler's claims are, essentially, ineffective assistance of counsel claims.

To challenge successfully a conviction or sentence under § 2255 based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-prong test set forth in the seminal case of *Strickland v. Washington,* 466 U.S. 668 (1984).   *See, e.g., United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011) ("To succeed on a Sixth Amendment claim of ineffective assistance of counsel, the defendant must satisfy the two-prong test set forth in *Strickland.*"); *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012) (same).   First, the petitioner must show that his attorney's performance was "below an objective standard of reasonableness," measured by "prevailing professional norms."   *Strickland,* 466 U.S. at 688. This is known as the "performance prong" of the test.   Second, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense."   *Id.* at 687.   To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings.   *Id.*   A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697.

"Keenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"   *Lawrence v. Branker*, 517 F.3d 700, 708 (4th Cir. 2008) (quoting *Strickland,* 446 U.S. at 689).   Indeed, the

Fourth Circuit has repeatedly stated that the first *Strickland* prong is "'difficult'" to establish. *Lawrence*, 517 F.3d at 709 (quoting *James v. Harrison,* 389 F.3d 450, 457 (4th Cir. 2004)). And, there can be no post-conviction relief based on attorney error where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

1.

The record reveals that, in many instances, Saunders either actually did do what Butler claims he did not do, or that Saunders chose not to take certain actions for valid reasons or as a matter of sound or reasonable strategy. This is true with regard to Butler's claims numbered above as 1, 2, 3, 5, 7, 10, 13, 14, 16, and 17. In each instance, Saunders's performance "'f[ell] within the wide range of reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland,* 446 U.S. at 689). I will first address claims 13, 14, and 16, and then turn to inter-related claims 10, 17, 1, 2, 3, 5, and 7.

In Claim 13, Butler asserts a handful of alleged failures related to Saunders's pretrial investigation.

First, Butler faults Saunders for not "thoroughly research[ing] the law related to the federal Sentencing Guidelines." Memo at 38. In his Affidavit, Butler says that, before trial, he was led by Saunders to believe that the charge on Count One "would generate a Guid[e]line[s] sentence that was based on the amount of drug[s] attributed to [him], 'relevant conduct,' and acquitted conduct." Butler Aff. ¶ 7. This indicates that Saunders and Butler did talk about how the Guidelines would apply, at least generally, and that Saunders was knowledgeable about them. Of specific import here, Butler's Affidavit shows that Saunders knew, pretrial, that "acquitted

conduct," such as the conduct underlying the "murder" charge, could be taken into consideration at sentencing, even if Butler were acquitted.  Butler Aff. ¶ 7.

Butler also faults Saunders for "repeatedly inform[ing] [him] that he [Butler] could not access the discovery materials because the Assistant United States Attorney (AUSA) had instructed counsel not to allow such … ."  Memo at 38; *see also* Butler Aff. ¶ 10 (stating Saunders advised him, before trial, that Butler could not "see the materials bec[au]se the AUSA told [Saunders] not to allow [Butler] access to the discovery").  However, it appears that Saunders repeatedly tried to obtain for Butler what Butler wanted, *see* Butler Aff. ¶ 10; Letters, ECF 498, 501,[9] but the AUSA refused to share it.  Letters, *id*.  And, Judge Legg expressly agreed with the AUSA's position.  *See* ECF 530.  Indeed, it is unclear what more Saunders could have done to help Butler in this regard.

Finally, Butler asserts that Saunders "failed to communicate" with him about "certain dates and certain times that [Butler] believed" his coconspirators falsely testified about, "never informed [him] about the prosecution's intent to introduce evidence [from witness] Anna Cruz," an "alleged Mexican cartel member," and refused to share the name of a private investigator supposedly employed in the case.  ECF 564-1, Memo at 39.  The record neither corroborates nor contradicts these statements.  But, as stated, *Strickland*'s performance prong is "difficult" to establish, *Lawrence*, 517 F.3d at 709 (quoting *James*, 389 F.3d at 457),  and I cannot see how any of these allegations lead to the conclusion that Saunders's performance fell outside the "wide range of reasonable professional assistance."  *See Lawrence*, 517 F.3d at 708; *United States v. Terry*, 366 F.3d 312, 314 (4th Cir.) (holding counsel's decision not to call "three inmates who could have allegedly offered exculpatory testimony" as witnesses not below "wide range of

---

[9] Although the letters marked as ECF 498 and 501 relate to post-trial, not pretrial proceedings, the same logic would have applied pretrial.  Paragraph 10 of Butler's Affidavit relates to pretrial requests and apparently concerns the same requested material.

professionally competent performance"), *cert. denied*, 543 U.S. 983 (2004).  And, even if these allegations were true, I see no prejudice here.  It is "not reasonably likely that [the alleged errors] would have made any difference in light of all the other evidence of guilt."  *Berghuis*, *supra*, 560 U.S. at 390 (2010).  *See, e.g.*, ECF 390, Post-Verdict Opinion at 2.

In Claim 14, Butler argues that Saunders ineffectively cross-examined three witnesses at trial: Antoine Boston, Geraldmain Wilkerson, and Rafael Rodriguez.  Memo at 41- 44.  With regard to Boston and Wilkerson, Butler faults Saunders for "failing to expose" the "misleading impression" the prosecutors gave the jury "that it would ultimately be up to the judge what sentence [the witnesses] received for [their] cooperation."  Memo at 42, 43 (citation omitted). Butler misapprehends the sentencing process.  Indeed, the prosecutors were correct — ultimately, it is up to the judge to determine the sentence of the codefendants.  *See, e.g.*, 18 U.S.C. § 3553.

With regard to Wilkerson, Butler also alleges that "Saunders'[s] cross-examination of … Wilkerson was less than lackluster and ineffective ([Trial Transcript], pp. 85-94)."  Memo at 43. This unexplained reference to the transcript is nothing more than a "vague and conclusory" allegation that "may be disposed of without further investigation by … [this] court."  *Dyess*, *supra*, 730 F.3d at 359, *see also* Opposition at 22 ("The Government agrees with Mr. Saunders that an examination of the transcript (and an acquittal of the murder count) speaks to Mr. Saunders['s] effective cross-examination.").  Alternatively, nothing in this one-sentence allegation leads to the conclusion that Saunders's performance fell outside the "wide range of reasonable professional assistance."  *See Lawrence*, 517 F.3d at 708.

Regarding Rafael Rodriguez, Butler argues that Saunders should have "used Rodriguez's perjurious Grand Jury testimony to impeach his credibility as a witness."  Memo at 43.  Butler

adds that "Rodriguez was debriefed on multiple occasions and made prior inconsistent statements, yet … Saunders did not use such to impeach" the witness. *Id*. The record shows, however, that Saunders did cross-examine Rodriguez on statements he made in meetings with the government. ECF 564-2, Rodriguez Cross at 16-17, 20-21. And, the record shows that these statements concerned the exact same subject matter that Butler claims amounted to "perjurious" testimony before the grand jury. *Compare* Memo at 4 (describing "perjurious" Rodriguez statements) *with* Rodriguez Cross at 16-17, 20-21 (showing Saunders cross-examining Rodriguez on same underlying facts). The transcript also reveals that Saunders was able to elicit an admission from Rodriguez that he (Rodriguez) had been mistaken in previous statements to the government about when he first met and began working with Butler. *Id*.

Rodriguez's grand jury testimony is not part of the record before me, although Butler has repeatedly tried to obtain copies of this testimony so that he could submit it. *See, e.g.*, ECF 569, Discovery Motion at 2; ECF 490, "Motion/Letter" submitted to Judge Legg on July 24, 2010. I also note that Saunders apparently did not reference the grand jury testimony in his cross-examination of Rodriguez at trial. *See generally* ECF 564-2, Rodriguez Cross. However, Saunders *did* cross-examine Rodriguez on the same underlying subject matter, and *did* elicit statements that the jury could have interpreted as undermining Rodriguez's credibility. Therefore, I cannot find that Saunders's performance fell outside the "wide range of reasonable professional assistance." *See Lawrence*, 517 F.3d at 708. Moreover, I can see no reasonable probability that the verdict would have been any different if only Saunders had put this one additional fact about Rodriguez's grand jury testimony before the trial jury. *See* Post-Verdict Opinion at 2 (summarizing evidence against Butler); Appellants' Brief, 575-6 at 6 (same). Thus, no prejudice resulted.

In Claim 16, Butler accuses Saunders of "essentially abandoning" him during the sentencing proceedings.  Memo at 45.  The record shows that Saunders argued, in writing and at the hearing, against both of the sentencing adjustments that the government sought.  *See generally* ECF 411, 411-1, Letters; ECF 482, Sentencing Transcript.  Saunders also investigated Butler's personal history and presented an argument for leniency to Judge Legg on that basis.  Sentencing Transcript at 51-52.  In addition, three character letters were submitted on Butler's behalf.  ECF 420.

Butler specifically asserts that Saunders was ineffective because he failed to submit "evidence that Walter Horton shot and killed victim Rodriguez," and did not cross-examine a government witness whose testimony at the sentencing offered a direct link between Butler and Rodriguez's murder.  Memo at 46.  However, the record is clear that Saunders did summarize at sentencing the arguments that he (Saunders) presented at trial in support of Butler's theory that it was Horton who killed Rodriguez.  Sentencing Transcript at 38-39.  It is not clear what other "evidence" supporting Horton's guilt Saunders "had access to" that should have been submitted at sentencing.  *See* Memo at 46.  And, in light of the government's arguments that the murder should be attributed to Butler, whether or not Butler pulled the trigger, Sentencing Transcript at 30, Saunders's decision not to cross-examine a witness whose testimony at sentencing only added evidence as to a *direct* link between Butler and the murder was not "below an objective standard of reasonableness."  *See Strickland*, 466 U.S. at 688.

In sum, Saunders did not "abandon" Butler at sentencing.

I turn next to a number of claims related to Butler's concerns with the way the government used certain information and Saunders's decisions not to challenge these various uses, at trial or on appeal.  In particular, I focus on Claims 10, 17, 1, 2, 3, 5, and 7.

In Claim 10, Butler argues that Saunders was ineffective at the motions hearing on November 18, 2009, with respect to various motions to suppress evidence allegedly obtained in violation of the Fourth Amendment.  Memo at 26-29.  First, as described above, Butler raised concerns about Saunders's performance on this point before the hearing, with both Saunders and Judge Legg.  *See* ECF 279, Butler Letter received Oct. 28, 2009 (alleging Saunders was not properly prepared for the motions hearing and had done no work of his own).  Saunders responded to Butler's letter by submitting two memoranda, the Wiretap Motion, *supra*, ECF 280, and the Search Motion, *supra*, ECF 281, which supplemented motions on point that were already filed by counsel for other defendants.  *See*, *e.g.*, ECF 141 (wiretap suppression); ECF 215 (joinder on motions).  Judge Legg considered Butler's concerns in a teleconference and ultimately declined to appoint new counsel.  *See* ECF 283, Memorandum to Counsel dated Nov. 5, 2009.  Judge Legg was alerted to Butler's concern, and apparently discerned no basis to conclude that Saunders was not providing effective representation of Butler.  Certainly, the judge would have known that it is common for one lawyer to join in or adopt the motion filed by another lawyer.  Indeed, such a practice is often encouraged, to avoid needless repetition of the same contentions.

Moreover, the specific advice that Butler points to as erroneous was well within an objective standard of reasonableness.  Butler states in his Memo that he told Saunders that the statement of CS-1 used in support of the Wiretap Affidavit, described *supra*, "was identical to the one used in the 'Red Dot' heroin conspiracy from 2002," and that he told Saunders "that there was no warrant for the GPS device[s]" used on the Butler and Wright vehicles.  Memo at 26.  Butler relates that "[c]ounsel told movant … that … the statement of CS1 from the prior prosecution could be used even though the case was dismissed, and that law enforcement did not

need a warrant to install the GPS device on his vehicles." Memo at 27.  Butler believes this was "nonsensical advice," *id.*, and that counsel was wrong to "refus[e] to investigate the plausibility of this line of defense." *Id*. at 26.

The fact that federal drug charges were once dismissed against Butler, *see* ECF 49 in Crim. No. CCB-06-00057, and that some evidence was suppressed in that case, *see* ECF 39 in *id.*, does not necessarily foreclose the use of *any* information obtained in that case in another case.  At least one federal district court has held that previously suppressed evidence cannot subsequently be used in an affidavit in support of probable cause to issue a search warrant.  *See United States v. Huerta*, No. 2:08-CR-102(01), 2009 WL 5065694, at *3 (E.D. Tenn. Dec. 16, 2009) (holding discovery of firearm and drugs obtained in illegal search of person cannot subsequently be used to support issuance of new search warrant).  However, in that case, law enforcement re-used the very same evidence that was suppressed.  Here, Butler disputes the use of the statement of CS-1 in the Wiretap Affidavit, but the statement was not previously suppressed.  *See* ECF 39, Crim. No. CCB-06-00057 ("ORDER granting 25 Motion to Suppress Evidence as to the stop and arrest of Defendant; suppressing evidence seized as a result of his arrest, including the keys, the electronic access cards and the evidence found in Storage Unit G35 … .").  Butler cites no authority in support of his argument that the use of CS-1's statements in the Wiretap Affidavit was illegal.  Memo at 26-29.  I see no reason to find that Saunders was professionally unreasonable for not making what would have apparently been a novel argument. *See Lawrence*, 517 F.3d at 709 (*Strickland* performance prong is "difficult" to establish).

Similarly, before and during Butler's trial, Saunders's advice that law enforcement did not need a warrant to install the GPS devices was professionally reasonable.  Throughout his Memo, in relation to the GPS use, Butler relies on *United States v. Jones*, ___ U.S. ___, 132 S.

Ct. 945 (2012), in which the Supreme Court held that the warrantless use of GPS tracking devices on a suspect's vehicle violates the Fourth Amendment. *E.g.*, Memo at 14-18. However, *Jones* was decided *after* Butler's trial and appeal. *See supra*. In 2009, the Fourth Circuit had not yet considered whether warrantless GPS use violated the Fourth Amendment. *Ricks v. United States*, Crim. No. WDQ-09-0428, 2013 WL 5603591, at *3 (D. Md Oct. 10, 2013).[10]

At the relevant time, "courts generally recognized *United States v. Knotts*, 460 U.S. 276 (1983), as controlling" *Id.* "In *Knotts*, the Supreme Court held that placing a tracking device in a barrel of chloroform sold to a suspect and tracking its movements did not violate the Fourth Amendment." *Id.* It was reasonable for Saunders to believe this foreclosed an argument that warrantless GPS use violated the Fourth Amendment. Indeed, one federal appellate court held just that in 2007, prior to Butler's trial. *United States v. Garcia*, 474 F.3d 994, 997–998 (7th Cir. 2007). Two held the same in published opinions in 2010, one during and one after Butler's trial. *United States v. Pineda-Moreno*, 591 F.3d 1212, 1216–17 (9th Cir. Jan. 11, 2010); *United States v. Marquez*, 605 F.3d 604, 609–610 (8th Cir. May 21, 2010). Prior to *Jones,* one appellate court had held in a reported decision that the warrantless use of a GPS device violates the Fourth Amendment. *See United States v. Maynard*, 615 F.3d 544 (D.C. Cir. Aug. 6, 2010). But, that ruling was made *after* Butler's trial.

Recently, in *United States v. Stephens,* 764 F.3d 327, No. 12-4625, 2014 WL 4069336 (4th Cir. August 19, 2014), the Fourth Circuit declined to apply the exclusionary rule to the pre-*Jones* use of a GPS tracking device. The Court recognized that, before *Jones*, "a significant body of federal law existed nationally … to support the view that warrantless attachment of a GPS to a vehicle was not a search within the meaning of the Fourth Amendment or was

---

[10] A Maryland State court had upheld the warrantless use of GPS devices on motor vehicles. *See Stone v. State,* 178 Md. App. 428, 941 A.2d 1238 (2008). *See also Kelly v. State*, 436 Md. 406, 82 A.3d 205 (2013) (addressing state of the law before *Jones*).

permissible when officers possessed reasonable suspicion that criminal activity was afoot." *Id.* at *4. The court also observed that although *Knotts* involved the use of a beeper, "it 'was widely and reasonably understood to stand for the proposition that the Fourth Amendment simply was not implicated by electronic surveillance of public automotive movements.'" *Id.* (quoting *United States v. Sparks,* 711 F.3d 58, 67 (1st Cir. 2013). It concluded that the use of the GPS was objectively reasonable at the time, based on *Knotts. Id.* at *7.

The same analysis would apply here. Therefore, the exclusionary rule would not have applied to the warrantless use of the GPS, even if Saunders had successfully argued that such conduct violated Butler's Fourth Amendment rights.

In sum, Saunders's advice on this point was not ineffective. *See Ricks*, 2013 WL 5603591, at *3 ("Ricks's counsel was not ineffective for advising Ricks that, under federal precedent, the GPS tracking evidence could not be successfully challenged... ."); *United States v. McNamara*, 74 F.3d 514, 516 (4th Cir. 1996) ("[A]n attorney's failure to anticipate a new rule of law [is] not constitutionally deficient.").

Although this disposes of Claim 10, I also note that Butler's arguments as to prejudice are not persuasive. Butler contends that if CS-1's statement and the information obtained from GPS devices had been suppressed, the wiretap would never have been approved, and the government would not have collected any of the call information or subsequent search evidence. *See, e.g.*, Memo at 28. He asserts that, without this, "the government doesn't possess a scintilla of evidence ...." *Id.* However, as described in the facts above, neither CS-1's information nor the GPS data played a major part in support of the probable cause outlined in the Wiretap Affidavit. Suppression of this information would not have made *any* difference in Butler's case (even assuming a suppression analysis would apply to the use of this information in the Wiretap

Affidavit, *see Huerta*, 2009 WL 5065694, at *3 (considering whether probable cause existed without reliance on suppressed evidence)).  Thus, Claim 10 is unavailing, for failure to show prejudice.

In Claim 17, Butler asserts that Saunders "was ineffective for failing to brief and argue on appeal the district court's ruling denying the suppression motions."  Memo at 47.  As just discussed, Saunders was aware of Butler's arguments about the Wiretap Affidavit and evidence recovered in subsequent searches.  Saunders advised Butler, before the hearing on suppression motions and before trial, that he did not believe these were winning arguments.  Consequently, Saunders did not make them before the trial judge.  In my view, this advice was within prevailing professional norms.

Moreover, because Saunders did not raise these specific suppression arguments at trial, if he had raised them on appeal, the appellate court would likely have applied a plain error standard of review.  *See* Fed. R. Crim. Pro. 52(b); *United States v. Ramirez-Castillo*, 748 F.3d 205, 211-12 (4th Cir. Apr. 30, 2014) (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)).  Plain-error review is "permissive, not mandatory," and errors will be reversed only where "'the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'"  *Id.* at 212 (quoting *Olano*, 507 U.S. at 736).  This is a high bar.  There is no reasonable probability that the Fourth Circuit would have vacated Butler's conviction on these grounds even if Saunders had appealed them.  *See Roach v. Angelone*, 176 F.3d 210, 222 (4th Cir. 1999) (holding that appellate counsel's performance was not deficient when counsel did not raise an argument on appeal that defendant wished to be raised when the argument was not likely to win).

Claims 1, 2, 3, 5, and 7 are all variations on this same evidence-suppression theme.  Claim 1 relates to the government's use of CS-1's statements in the Wiretap Affidavit.  Memo at

2.  Claim 2 relates to the government's use of the GPS data in the Wiretap Affidavit.  Claim 3 relates to the alleged use of perjured testimony from Rafael Rodriguez before a grand jury. Memo at 4.  Claim 5 accuses the trial court of abuse of discretion for failing, *sua sponte*, to suppress the evidence challenged in claims 1, 2, and 3.  Memo at 7-9.  Claim 7 again alleges that the warrantless use of GPS devices on vehicles violated Butler's Fourth Amendment rights and that resulting evidence should have been suppressed.  Memo at 14.

As discussed above, the government asserts that all of these claims are procedurally barred.  However, Butler adequately framed them as ineffective assistance of counsel claims. Therefore, I will consider them under the test established in *Strickland*, *supra*, 466 U.S. at 687.

As also discussed above, I have already held that Saunders's initial decisions not to present to the trial court Butler's various arguments regarding the use of CS-1's statements, GPS data, and Rodriguez's "perjurious" testimony were within "an objective standard of reasonableness."  For the same reasons, I cannot conclude that Saunders breached the *Strickland* standard by failing to appeal supposed errors committed by the government and the trial court when the arguments underlying those "errors" rely on the very same arguments already rejected. *Compare* claims 10, 14 *with* claims 1, 2, 3, 5, and 7.  I add that, because there claims were not raised at trial, at best, the Fourth Circuit would review these claims for "plain error."  *E.g.*, *Ramirez-Castillo*, 748 F.3d at 211-12.  Again, this is a high bar, and I cannot find there is any reasonable probability that the Fourth Circuit would have vacated Butler's conviction on any of these grounds, even if Saunders had raised them on appeal.  *Id.*

In sum, there is no merit to claims 1, 2, 3, 5, 7, 10, 13, 14, 16, and 17.  In each instance, the record conclusively shows that Saunders was constitutionally effective.  *See Strickland*, 446

U.S. at 689; *Lawrence*, 517 F.3d at 708; *see also* Rule 4(b) of the § 2255 Rules.  Moreover, in each instance Butler failed to show prejudice.  *See Strickland*, 446 U.S. at 694.

2.

Claim 4 accuses the government of "improper conduct."  With Butler's citations to cases omitted, the claim states as follows, ECF 564-1, Memo at 6-7:

> A prosecutor may not refer to previous convictions, or other bad acts of the defendant, codefendants, or coconspirator. …  The prosecutor may not vouch for the credibility of government witnesses as it did at the movants [sic] suppression hearing. …

> In addition, the prosecutor may not knowingly present false evidence, i.e., testimony, and has a duty to correct testimony that he or she knows to be false. … Further, the prosecutor must disclose evidence favorable to the defendant, and may not use staged testimony to attempt to introduce inadmissible evidence. …

> The prosecutor here, committed the above conduct.

These allegations are "vague and conclusory."  *Dyess*, 730 F.3d at 359.  The second paragraph presumably refers to the conduct already alleged and disposed of in claims 1, 2, and 3. I cannot guess what the first paragraph refers to, and I need not go looking.  *Id.*  Accordingly, Claim 4 is without merit under Rule 4(b) of the § 2255 Rules.

3.

With regard to Claims 9, 11, 15, 18 and 6, Butler has not carried his burden to show a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *See Strickland*, 466 U.S. at 694; *see also id.* at 697 ("[A court] need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.").  In my view, the record conclusively shows that Butler is not entitled to relief on these claims.  *See Raines*, 423 F.2d at 530.

In Claim 9, Butler complains that Saunders "was ineffective for … not preserving Movant's Constitutional and statutory speedy trial rights and fail[ing] to object, or otherwise preserve for review, the violation of Movant's speedy trial rights."  Memo at 21.

As noted, the trial court granted the government's Speedy Trial Motion on December 15, 2008.  ECF 129.  The Clock Order excluded time from the date of the Order until the trial on January 11, 2010.  *Id.*  The court found that the exclusion was in the interests of justice, pursuant to 18 U.S.C. § 3151(h),[11] based on specific findings that the "case involves some complex issues and thus it would be unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by the Speedy Trial Act;" that "the requested exclusion of time would provide the defendants and counsel sufficient time to review fully all of the voluminous discovery materials and to prepare and file pretrial motions, and will help ensure continuity of counsel;" that it "would allow the parties sufficient time for discussions regarding a disposition;" and that "failure to set trial beyond the speedy trial date … would deny counsel for the defendants and the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence."  *Id*. at 1-2.

To be sure, the record shows that Saunders did not object to (or, therefore, preserve for review) the alleged violation of Butler's speedy trial rights.  Saunders avers in his Affidavit that the case was "too complicated to be tried within seventy days of indictment," and that he

---

[11] The Clock Order specifically cited 18 U.S.C. § 3161(h)(8).  On October 13, 2008 — two months before the Clock Order — Congress amended 18 U.S.C. § 3161.  In relevant part, it moved the text of what had been § 3161(h)(8) into § 3161(h)(7).  *See* Judicial Administration and Technical Amendments Act of 2008, Pub. L. No. 110-406, § 13, 122 Stat. 4294.  However, it did not change the substance of the text in any way.  *See id*., § 13 ("Section 3161(h) of title 18 … is amended — (3) by redesignating paragraphs (6) through (9) as paragraphs (5) through (8), respectively.").  I am confident that the Order inadvertently cited § 3161(h)(8), given that it also recited the text of what is now (and was then) the text of § 3161(h)(7).

"accepted the government's motion for the postponemen[t of trial] for the advantage of preparation and in the interest of [Butler's] case."  ECF 575-8, Saunders Aff. at 3.  It also appears that Saunders did not consult with Butler about this decision.  *Compare* Butler Aff. ¶  4, 5 (alleging Saunders waived Butler's speedy trial rights against instructions to the contrary and without telling Butler first) *with* Saunders Aff. at 3 (justifying the decision but not denying those allegations).

The Speedy Trial Act generally requires that trial begin within seventy days from the latter of a defendant's indictment or appearance.  18 U.S.C. § 3161(c).  But, there are many reasons for which time may be excluded from this computation.  Here, the relevant sections read as follows: "(h) The following periods of delay shall be excluded in computing the time within which … the trial of any such offense must commence: … (7)(A) Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.  (B) The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case are as follows: … (ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect

adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section." 18 U.S.C. § 3161(h)(7) (Supp. III 2009).

At this stage, in order to show a reasonable probability that the result of the proceedings would have been different but for counsel's (supposed) errors, Butler has the burden to prove a very long chain of what-ifs. First, even if Saunders had opposed the government's Speedy Trial Motion, *supra*, ECF 128, it is not at all certain that Judge Legg's Order would have come out differently. At the time, Butler had nine other codefendants. None of the other defendants opposed the Speedy Trial Motion. *Id.* Thus, Judge Legg would have been faced with nine defendants who apparently agreed that the delay was in the best interest of all parties, as against one, Butler, who did not. *See* Speedy Trial Motion, ECF 128; Clock Order, ECF 129; *see also United States v. Jarrell*, 147 F.3d 315, 316 (4th Cir. 1998) ("In a case involving several defendants, time excludable for one defendant is excludable for all defendants.").

Second, even if I could find a reasonable probability that Judge Legg would have denied the motion, Butler would still have the burden to show a reasonable probability that a violation of the Speedy Trial Act actually would have resulted thereafter — and *then* Butler would have to show a reasonable probability that, following the violation, if Saunders had filed a motion to dismiss the indictment under 18 U.S.C. § 3162(a), either Judge Legg would have dismissed the indictment with prejudice, or that some result other than Butler's current conviction and sentence would have come out of a dismissal without prejudice. As it stands, Butler does not even establish a reasonably probability that a violation of the Speedy Trial Act would have resulted if Judge Legg had denied the government's Speedy Trial Motion.

In his Memo, Butler asserts that a statutory violation did occur, Memo at 22:

In this particular case the Movant made his first appearance on September 11, 2008. The District Court granted the Government's Motion to Exclude Time

Under the Speedy Trial Clock on December 15, 2008.  Thereafter, the District Court made absolutely no findings under § 3161(h)(1), yet the Movant's trial did not begin until January 5, 2010 — sixteen months after the Movant's first appearance on September 11, 2008.  (citations to record omitted).

This argument is incorrect for two reasons.  First, the clock did not start to run until the day after the initial appearance of the last codefendant on the indictment.  *Jarrell*, 147 F.3d at 316 (stating "time excludable for one defendant is excludable for all defendants"); 18 U.S.C. § 3161(c) (stating speedy trial clock starts to run from either the defendant's indictment or appearance, whichever is later); *United States v. Stoudenmire*, 74 F.3d 60, 63 (4th Cir. 1996) (holding that the speedy trial clock starts the day after "the day of the event that triggers the STA clock"); *see also Henderson v. United States*, 476 U.S. 321, 323, 323 n.2, 331 (1986) (holding Speedy Trial Act clock began to run from the date of final codefendant's arraignment).  Here, the clock began to run on October 18, 2008, one day after the initial appearance of the last of the ten defendants.  *See* Speedy Trial Motion at 1.  Second, the speedy trial clock stopped running when Judge Legg entered the Clock Order on December 15, 2008, *see* ECF 129, and it was effective through Butler's trial in January 2010.  *See id.*

The time between October 18, 2008 and December 15, 2008, was less than seventy days.  *See* 18 U.S.C. § 3161(c) (establishing seventy-day window to begin trial).  Thus, there was no Speedy Trial Act violation in this case, and Butler's Memo does not show that there would have been a reasonable probability of a violation if Saunders had opposed, and Judge Legg had denied, the Speedy Trial Motion.

Moreover, much of the time that elapsed between initial appearances and trial is attributable to the court's consideration of the defendants' pretrial motions.  *See, e.g.*, ECF 141 (motion to suppress wiretap evidence), filed on Jan. 22, 2009; ECF 280, Wiretap Motion (supplementing ECF 141); ECF 294 (motions hearing held Nov. 18, 2009); ECF 302 (order

denying motions to suppress evidence, including ECF 280), dated Nov. 24, 2009.  Consideration of pretrial motions tolls the Speedy Trial Act clock.  *See* 18 U.S.C. § 3161(h)(1)(D) ("delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of" the motion is excluded from computation); *see also United States v. Hopkins*, 310 F.3d 145, 149-50 (4th Cir. 2002) ("Although nearly two years passed between [defendant's] initial indictment and the commencement of his trial, his statutory right was not violated because the delay was occasioned almost exclusively by motions and request from the defendant himself.")  Thus, Butler has failed to show prejudice and the claim must be denied.

With regard to the second part of Butler's speedy trial claim, alleging a violation of the Sixth Amendment, I also find that Butler has failed to carry his burden to show prejudice.  Under *United States v. Thomas*, 55 F.3d 144, 148 (4th Cir. 1995) (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)), if Saunders had tried to allege a Sixth Amendment speedy trial violation on Butler's behalf, he would have had to show that "on balance, four separate [*Barker*] factors weigh[ed] in his favor: whether the delay before trial was uncommonly long, whether the government or the defendant was more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result."  "Prejudice 'should be assessed in light of the interests … the speedy trial right was designed to protect.'" *United States v. Grimmond*, 137 F.3d 823, 829 (4th Cir. 1998) (quoting *Barker*, 407 U.S. at 532)).  "These interests include: (1) preventing oppressive pretrial incarceration, (2) minimizing the anxiety and concern of the accused, and (3) limiting the possibility that the defense will be impaired." *Grimmond*, 137 F.3d at 829.  "Of the three defense interests identified … 'the most serious is the last, because the inability of a defendant adequately to prepare his case skews the

fairness of the entire system.'" *United States v. Hall*, 551 F.3d 257, 273 (4th Cir. 2009) (quoting

*Barker*, 407 U.S. at 532).

As to the first *Barker* factor, Butler correctly points out that the Fourth Circuit has said

that "courts have often concluded that a delay of over one year is presumptively prejudicial."

*United States v. Trotman*, 406 F. App'x 799, 807 (4th Cir. 2011) (citing, *e.g.*, *Doggett v. United

States*, 505 U.S. 647, 652 n.1 (1992)); Memo at 24.  However, in this case, and with regard to the

second factor, it appears that much of the delay is attributable to consideration of pretrial motions

that Butler made or joined.   At least one suppression motion joined by Butler was under

consideration for ten of the sixteen months between Butler's initial appearance and the trial.  *See*,

*e.g.*, ECF 141 (motion to suppress wiretap evidence), filed on Jan. 22, 2009; ECF 280, Wiretap

Motion (supplementing ECF 141); ECF 302 (order denying motions to suppress evidence,

including ECF 280), dated Nov. 24, 2009.  Regarding the third factor, Butler has consistently

asserted his wish for a speedy trial.   *See* ECF 564-6, Butler Aff. ¶ 4; ECF 292, Pro Se Motion.

But, regarding the fourth factor, Butler has not shown, in any detail, any possibility that his

defense was impaired by the delay.

In Butler's Affidavit, ECF 564-6, at paragraph 17, he avers:

> That the delay in my criminal case caused prejudice because I was deprived [of
> the] benefit of witnesses who were unable to recall events that occurred long
> before, that evidence in the form of documents and records were lost over time,
> that I could not establish contact with potential witnesses that had relocated over
> time, that codefendants were turned in the months between initial charges and
> trial, that the government was able to seek more sever[e] charges connected with
> the original drug charges that should have been tried in 70 days to start with[,]
> depriving the prosecution any foundation for more serious drug and firearms
> charges[.]

In *Hall*, 551 F.3d at 273, the Court found that defendants had not shown prejudice

because they had "not identified any witnesses that were unavailable as a result of the delay," or

"any witness [who] was unable to accurately recall the relevant events," or "any evidence that was rendered unavailable by the delay." *See also Grimmond*, 137 F.3d at 830 (same). The same can be said for Butler's conclusory assertions above.

On balance, Judge Legg spent many months managing a complex, multi-defendant case, including entertaining defendants' various suppression motions, as well as guilty pleas and sentencings of codefendants. I can discern no reasonable probability that he would have found that the delay, generally or between deciding those motions and the beginning of trial, rose to the level of a Sixth Amendment violation. *Cf. Barker*, 407 U.S. at 522 (quoting *Beavers v. Haubert*, 198 U.S. 77, 87 (1905)) ("'The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice.'"). This is especially true in light of the fact that Judge Legg knew of Butler's speedy trial concerns at least by November 2009. *See* Pro Se Motion, *supra*. Claim 9 must therefore be denied for failure to show prejudice. *Strickland*, 466 U.S. at 694.

Claim 11 fails, for lack of prejudice. In Claim 11, Butler argues that Saunders was ineffective because he failed to bring to the trial court's attention a "complete breakdown in attorney/client relations." Memo at 29. However, the record shows that Butler repeatedly brought this issue to Judge Legg's attention, without the aid of Mr. Saunders. *E.g.*, ECF 279, Butler Letter received Oct. 28, 2009; ECF 292, Pro Se Motion. In his Memo, Butler states that Judge Legg ignored Butler's entreaties, but the record shows that Judge Legg conducted an inquiry into the matter. ECF 283, Memo to Counsel dated Nov. 5, 2009. There is no reason to believe that Judge Legg would have considered the issue differently if Saunders had submitted these letters or concerns on Butler's behalf.

Claim 15 is also unavailing, for lack of prejudice.  Here, Butler accuses Saunders of "failing to object or preserve for review the trial court's restriction on cross-examination of [a] cooperating witness."  Memo at 44.  The record shows counsel for Wright cross-examined cooperating witness Antoine Boston at length.  ECF 575-12 at 103-173, Trial Transcript, Cross-Examination of A. Boston by J. Balter.  Saunders also cross-examined Boston.  *Id*. at 173-182.  After a short re-direct examination by the government, *id.* at 182-185, Balter asked the court's permission to re-cross Boston.  *Id*. at 185.  In short, Balter sought to make a point in support of his "theory" that Boston "was telling the government what he thought the government needed with respect to the prosecution of those who were charged in the initial indictment."  *Id*. at 185.  After hearing Balter's arguments in support of the request, *id.* at 185-88, Judge Legg denied Balter's request.  *Id*. at 188.  The alleged error was preserved by counsel for Wright.  *See id*.; *United States v. Lynn*, 592 F.3d 572, 578 (4th Cir. 2010) ("[T]he Rules [of federal criminal procedure] expressly provide that '[a] party may preserve a claim of error by informing the court — when the court ruling or order is made or *sought* — of the action that the party *wishes the court to take* ….") (quoting Fed. R. Crim. P. 51(b)) (alteration and emphasis in original).

But, Saunders did not object to Judge Legg's ruling denying re-cross.  *Id*.  It is not clear whether Balter's objection preserved the issue for Butler; I have not searched the transcripts to determine whether defense counsel agreed that an objection by one lawyer applied to all lawyers.  In any event, Judge Legg had discretion to limit re-cross, and I see nothing unreasonable about his decision.  Thus, even if Saunders had preserved and appealed the alleged error, there is no reasonable probability that the Fourth Circuit would have vacated Butler's conviction on this ground, and there is no prejudice to Butler either way.  *Strickland*, 466 U.S. at 694.

Similarly, in Claim 18, Butler alleges that Saunders was ineffective "for failing to brief and argue that the district court erred by not making an inquiry with respect to movant's request for replacement counsel." Memo at 47. He argues that, "[a]ccording to Fourth Circuit case law a district court <u>must</u> make an inquiry into a defendant's request for [a] new attorney," and that "[h]ad counsel … argued this issue on direct appeal, the Fourth Circuit would have been bound by Circuit precedent to reverse Movant's conviction." Memo at 48 (emphasis in original). However, Butler's argument completely ignores the fact that the district court did make an inquiry into the matter. *See generally* ECF 283, Memo to Counsel dated Nov. 5, 2009.

In *United States v. Horton*, 693 F.3d 463, 467 (2012), the Fourth Circuit held that a harmless error analysis applies to a district court's denial of a request for appointment of new counsel. In *Horton*, the defendant filed a pro se motion requesting substitute counsel. *Id.* at 466. The district court denied the motion without any inquiry into Horton's concerns whatsoever. *Id.* at 466, 467. Nonetheless, the Fourth Circuit concluded that Horton was "not entitled to a reversal of his conviction because the error was harmless and did not result in any prejudice to him." *Id.* at 467. It found "clear evidence" that Horton's attorney "provided an adequate defense." *Id.* It emphasized that Horton did not show "any specific way in which his defense was hampered by any lack of communication with his counsel." *Id.*

Much the same can be said in this case, except that here, unlike in *Horton*, the district court *did* investigate the concerns Butler raised before trial. *See* ECF 283, Memo to Counsel dated Nov. 5, 2009. Moreover, to the extent that Butler has articulated some way in which he believes his defense was hampered — *i.e.*, "being compelled to … go to trial on fruits from a poisonous tree, and testimony from a previously dismissed case, etc.", Memo at 10 — I have already explained, *supra*, that Saunders's decisions with regard to these matters were

professionally reasonable.  Thus, even if I were to assume the trial court committed some error on this point, and that Saunders should have appealed that error, there is no reasonable probability that the Fourth Circuit would have overturned Butler's conviction based on these errors.  *See Horton*, 693 F.3d at 467.

Butler makes no other arguments on this point.  Thus, Butler has not carried his burden to show a reasonable probability that the result of the proceedings would have been different, but for counsel's errors.

Claim 6 is essentially the same as Claim 18.  In Claim 6, Butler alleges that the district court abused its discretion in denying Butler's request for new counsel because the court failed to conduct an inquiry into Saunders's alleged "conflict of interest."  ECF 564-1, Memo at 10.  He cites *Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980) and "*United States v. Stiger*, 413 F.3d 1185, 1194-96 (10th Cir. 2005) (courts failure to hold evidentiary hearing to determine whether conflict of interest adversely affected defendant entitled defendant to remand)."  *Id*.  Butler asserts that Saunders's "conflict of interest" was his "refusal to advocate [Butler's] cause via the deficiencies above, to his detriment, that being compelled to plea not guilty on misadvice of counsel; go to trial on fruits from a poisonous tree, and testimony from a previously dismissed case, etc."  *Id*.  I will deny Claim 6 for the same reasons articulated with respect to Claim 18.

In sum, Claims 9, 11, 15, 18, and 6 lack merit, because the record conclusively shows that Butler failed to prove prejudice as required under *Strickland*.

4.

Claims 8 and 12, the remaining claims advanced by Butler in his Memo, relate to plea negotiations.  I will reserve judgment on Claims 8 and 12 pending expansion of the record.

"In the context of pleas," Butler can make a claim for ineffective assistance of counsel if he can "show that there is a reasonable probability" that "the outcome of the plea process would have been different with competent advice." *Lafler v. Cooper*, 566 U.S. ---, 132 S. Ct. 1376, 1384 (2012). Specifically, "a defendant must show that but for the ineffective assistance of counsel there is a reasonable probability that the plea offer would have been presented to the court … , that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that were in fact imposed." *Id*. at 1385.

In Claim 8, Butler asserts that Saunders was constitutionally deficient because he failed to communicate to the government Butler's willingness to accept a guilty plea on one of the four counts against him, so long as the deal would not involve cooperation. In his Memo, ECF 564-1 at 18-19, Butler said: "Movant apprised counsel that he could not cooperate … Yet counsel would not negotiate … a plea void of cooperation or a conditional plea … ." In Butler's Affidavit, ECF 564-6, at paragraph eight, Butler said: "I told Saunders that I was not guilty of killing anyone and could not cooperate, but would possibly plead guilty to the drug charges. Attorney Saunder[s] stated that that was unacceptable even though he did not — to my knowledge — confer with the AUSA during our conversation[.]" And, in his Affidavit at paragraph five, in response to Saunders's advice that Butler should cooperate, Butler said: "I became frustrated and upset with counsel for going against my specific wishes and trying to have me be an informant." Butler further asserts that he suffered prejudice, stating: "Had counsel properly advised movant of his plea options at the plea bargaining phase, and attacked the prosecutorial misconduct in … the contentions … stated [in the Memo] … there [is] no way movant would have pled not guilty and insisted on a trial." Memo at 20.

In Claim 12, Butler argues: "Had counsel provided the Movant with adequate and competent legal advice [regarding the application of the federal Sentencing Guidelines], the Movant would have been amenable to plea negotiations resulting in his guilty plea and a sentence short of Life imprisonment without parole." Memo at 34. Further, Butler complains that Saunders did not provide him with adequate information and advice so as to enable him to make an "intelligent and informed" decision whether to pursue plea negotiations … ." *Id*. (Emphasis in original.)

Butler does not address whether different advice regarding the Guidelines would have changed his mind about whether to cooperate. *See* Butler Aff. ¶ 8 (stating he would not cooperate). Indeed, as set forth above, he has stated unequivocally that he would not cooperate.

Claims 8 and 12 fail if it is true that the government would not offer a plea for less than life unless Butler agreed to cooperate. Butler has said he would only "have been amenable" to a plea "resulting in … a sentence short of Life … ." Memo at 34. And, he states in his sworn Affidavit that he "told Saunders" that he "could not cooperate." Butler Aff. ¶ 8. Taking Butler at his word, his assertions plainly demonstrate that he was not amenable to a plea if it included any form of cooperation with the government.

In his Affidavit, ECF 575-8, Saunders states that "the government made it clear and Mr. Butler was so advised that nothing less than a life imprisonment plea was possible without cooperation. And as Mr. Butler sets out, cooperation was not something he was willing to consider." Saunders Aff. at 1. Saunders also avers, *id*:

> I should also note that during the pendency of this case Mr. Butler became a suspect in a kidnapping/torture/rape murder in the state of Maryland (he was subsequently convicted) which also contributed to the government's adamant position regarding any plea. Therefore counsel had no room to negotiate any plea bargain absent cooperation. Not incidentally Mr. Butler asserted he was innocent of the drug conspiracy as well.

Saunders included in his Affidavit pages of his own notes. *E.g.*, *id*. at 2. One of these images shows handwritten notes as follows: "∆ not interested in plea disc. ∆ adamant that he did not do murder; no way to deal w/ Gov, w/ [unintelligible] admit [unintelligible]." *Id*. Presumably, this states that "defendant was not interested in a plea discussion," and "defendant was adamant that he did not do [the] murder; [there is] no way to deal with government without [defendant's being willing to] admit that [he committed the alleged murder.]"

The government argues that, in any case, Butler has failed to show prejudice. In its Opposition at 13 n.2, ECF 575, the government notes that Butler does not state, unequivocally, that he would have pleaded guilty if the government offered a deal that did not involve cooperation. *See also* Memo at 20. Thus, it argues, "the defendant does not even appear to be claiming that he would have pleaded guilty to the indictment had his counsel been effective." Opposition at 13, n.2. Moreover, it claims that Butler would not plead if he had to cooperate, and the government was unwilling to negotiate a plea agreement without cooperation. Opposition at 20. "Thus," it concludes, "the defendant may or may not wish now that he had pursued a plea, but the Government *seemed disinclined* to enter into any such agreement." *Id*. (emphasis added).

As I see it, Butler and Saunders have submitted contradictory sworn statements as to whether Saunders sought a plea deal for Butler that did not include cooperation. Butler complains that Saunders never approached the government regarding a plea deal void of cooperation. *E.g.*, Butler Aff. ¶ 8. Saunders seems to say that he did, and that the government would agree to nothing less than life imprisonment without cooperation. ECF 575-8, Saunders Aff. at 1 ("[T]he government made it clear and Mr. Butler was so advised that nothing less than a life imprisonment plea was possible without cooperation."). This dispute concerns a material

fact, because Butler asserts that his decision-making would have been different if a plea deal without cooperation were possible, and that he did not know if it were possible because of counsel's performance.  ECF 564-1 at 23; ECF 575 at 20; *see also* Lafler, 132 S. Ct. at 1384. Thus, it appears that, with regard to Butler's Sixth Amendment claim, Butler presents "disputed material facts and a credibility determination is necessary to resolve the issue." *Robertson*, 219 F. App'x. at 286.

Moreover, the government has merely asserted in its Memo that it insisted on cooperation.  *See*, *e.g.*, Opposition at 20.  The government states: "Mr. Saunders' affidavit indicates that he spoke to the Government about a possible plea deal, but that the Government was adamant that a plea agreement include cooperation." *Id*.  It adds:  "Saunders further indicates that serious state charges were also pending, which made a plea deal particularly difficult." *Id*. at 12.  The government later asserts that it "*seemed disinclined* to enter into any such agreement." *Id*. at 20 (emphasis added).  In any event, it has not corroborated Saunders's assertion *with evidence*.

Noticeably absent is any affidavit or document from the government confirming that it refused to offer a plea deal to Butler void of cooperation, or that, without cooperation, it would only offer a plea to life imprisonment.  If either circumstance were so, Butler could show no prejudice resulting from Saunders's efforts regarding Claims 8 or 12, whatever they entailed. But, in its Opposition, the government relies wholly on its own assertions and Saunders's Affidavit to support its argument that "trial counsel was not ineffective in relation to plea bargaining."  ECF 575 at 11.

The Court recognizes that the prosecutor now assigned to this case did not handle the pretrial or trial proceedings.  However, there is no indication as to whether the government has searched its records as to this issue.

As discussed above, § 2255 requires that a court hold a hearing whenever a material fact is in dispute and resolution hinges on a credibility determination.  *Raines*, 423 F.2d at 430; *Witherspoon*, 231 F.3d at 926-27; *Robertson*, 219 F. App'x. at 286.  However, a hearing may be avoided if factual disputes can be resolved on the record alone.  *See Dyess*, 730 F.3d at 359; Rule 4(b) of the § 2255 Rules.  Toward that end, I may also seek to expand the record before deciding to hold a hearing.  *Pender*, 514 F. App'x at 361; Rule 7(a) of the § 2255 Rules.  I believe that, at this juncture, it is appropriate to attempt to expand the record.

In light of the foregoing, the government is hereby ordered to produce, within 30 days from the date of the docketing of the Order accompanying this Opinion, any evidence it may have regarding plea negotiations or attesting to the government's position on cooperation in Butler's case.  *See* Rule 7 of the § 2255 Rules.[12]  In the meantime, I will withhold judgment on Claims 8 and 12 until I have reviewed any additional submissions by the government.  Appointment of counsel for Butler, as requested, and a hearing under § 2255(b), may or may not be warranted at that time.

5.

Finally, in light of the foregoing, I will deny the Discovery Motion (ECF 569) as moot.  Three of the five requests relate to the evidence-suppression concerns Butler repeatedly argued in his Memo, and which I have denied.  *See supra*; Discovery Motion at 1-2.  It is unclear what the other two requests (both for photographs) relate to.  Discovery Motion at 2.  In any case,

---

[12] I note that George Hazel, one of the prosecutors in this case, is now a federal judge in this District.  To the extent that the government produces evidence from a former prosecutor who now sits as a judge in this District, my recusal would be necessary.

because they do not relate to Butler's remaining claims, I will deny the motion as moot.  And, I will deny the claims and relief requested in Butler's Supplemental Motions (ECF 582, 585) for the following reasons.

In ECF 582, Butler argues that he "is entitled to re-sentencing without the mandatory life sentence enhancement, because the jury never found Butler guilty … of this alleged conduct." ECF 582 at 3.  He cites *Alleyne v. United States*, --- U.S. ---, 133 S. Ct. 2151 (2013).  This claim apparently relates to Butler's misunderstanding about the sentencing process.  *See* discussion of Claim 14 *supra*.  *Allleyne* is not applicable to the facts of this case, because Butler was never subject to a "mandatory life sentence enhancement."  Even after Judge Legg applied the "murder cross-reference," the resulting Guidelines recommendation of life imprisonment was just that — an advisory recommendation.  *See, e.g.*, *United States v. Booker*, 543 U.S. 220 (2005).

Indeed, the district judge may not presume that the appropriate sentence is necessarily one that falls within the sentencing guidelines.  *Gall v. United States*, 552 U.S. 38, 49 (2007); *Rita v. United States*, 551 U.S. 338, 351 (2007).  It must consider all of the factors in 18 U.S.C. § 3553(a).  *Pepper v. United States*, ____ U.S. _____, 131 S.Ct. 1229, 1241 (2011).  Judge Legg was well aware of his duties.  *See* ECF 482 at 58, Sentencing Transcript, Statement of Judge Legg ("I will impose sentence pursuant to Section 3553(a)."); *id*. at 58-59 (discussing factors under consideration).  It was within Judge Legg's discretion to impose a lesser sentence in light of other factors, in accordance with 18 U.S.C. § 3553.  *See* § 3553(b)(1) ("Except as provided in paragraph (2) [relating to "child crimes and sexual offenses"], the court shall impose a sentence of the kind, and within the range, referred to in [the Guidelines] unless the court finds that there exists an aggravating or mitigating circumstance … .").  Thus, Butler is not entitled to vacatur of his sentence on the grounds raised in ECF 582.

In ECF 585, Butler argues that his conviction should be vacated because "the Federal Stored Communications Act (SCA) is unconstitutional," pursuant to a case recently decided by the United State Court of Appeals for the Eleventh Circuit.  ECF 585 at 1.  He cites *United States v. Davis*, 2014 WL 162244, No. 12-12982, (11th Cir. June 11, 2014) as holding that "the Fourth Amendment warrant requirement protects individuals' privacy in information about the locations of their mobile phones when they made or received calls."  *Id.*  Even if Butler had shown how that holding is relevant to the facts of this case, and even if he had shown how it would be procedurally possible to raise that claim now, a case from the Eleventh Circuit is in no way binding on this court or Butler's proceedings.  Accordingly, Butler is not entitled to vacatur of his conviction on the grounds raised in ECF 585.

## Conclusion

In sum, Butler has offered twenty potential grounds for overturning his conviction or sentence under 28 U.S.C. § 2255 — eighteen in his Motion, and two in his Supplemental Motions.  As discussed above, the files and records conclusively show that he is entitled to no relief on eighteen of these claims.  Butler's Supplemental Motions (ECF 582, 585) are therefore DENIED, and Butler's Motion (ECF 564) is also DENIED, except to the extent that the Motion challenges Saunders's effectiveness in plea negotiations (Claims 8 and 12).  Before resolving Butler's two plea-related claims, I will seek to expand the record.

An Order consistent with this Opinion follows.


Date:  October 15, 2014                              /s/
                                            _____
                                            Ellen Lipton Hollander
                                            United States District Judge