IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*, | |
| v. | Criminal No. ELH-08-381 |
| JOHNNIE BUTLER,<br>*Defendant*. | |

**MEMORANDUM OPINION**

Defendant Johnnie Butler is serving a life sentence in connection with a drug conspiracy involving murder.  In January 2010, a jury in the District of Maryland convicted Butler of conspiracy to distribute one kilogram or more of heroin and conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and (b)(1)(C) (Count One); possession of a firearm on September 11, 2008, in furtherance of the drug conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Three); and possession of a firearm by a convicted felon, under 18 U.S.C. § 922(g)(1) (Count Four). ECF 382.  Butler was found not guilty of Count Two, which charged discharge of a firearm on October 20, 2007, causing the death of Fernando Rodriguez.  *Id*. Nevertheless, Judge Benson Legg, to whom the case was then assigned, attributed the murder to Butler, and sentenced him to life imprisonment.  ECF 423 (Judgment).[1]  The conviction and sentence were affirmed on appeal.  *United States v. Butler & Wright*, 429 F. App'x 239 (4th Cir.), *cert. denied*, 565 U.S. 1063 (2011).

---

[1] The case was initially assigned to Judge Andre M. Davis, presumably because he was elevated to the Fourth Circuit.  In April 2009, the case was reassigned to Judge Legg, who presided at the trial of Butler and a codefendant, Calvin Wright. The case was reassigned to me in August 2012, due to Judge Legg's retirement.

Butler, who is now self-represented, has filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A).  ECF 734.  He subsequently filed an amended motion (ECF 756), supported by several exhibits.  ECF 756-1 to ECF 756-10.  I shall refer to ECF 734 and ECF 756 collectively as the "Motion."

In the Motion, Butler asks the Court to appoint counsel for him.  ECF 734 at 1.  The Office of the Federal Public Defender gave notice that it declines to represent Butler in this matter.  ECF 736.

The government opposes the Motion.  ECF 745 (the "Opposition").  The Opposition is supported by exhibits.  ECF 745-1 to ECF 745-3.  No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall deny the Motion, without prejudice

## I. Procedural and Factual Background

Butler and nine others were indicted on August 12, 2008.  ECF 1.  Beginning on January 5, 2010 (ECF 336), Butler and codefendant Calvin Wright proceeded to trial on a Fourth Superseding Indictment (ECF 321).  The trial consumed thirteen days.  *See* ECF 336, ECF 342, ECF 352, ECF 353, ECF 365, ECF 366, ECF 367, ECF 368, ECF 371, ECF 372, ECF 373.[2]

Defendant was convicted of conspiracy to distribute one kilogram or more of heroin (Count One); possession of a firearm in furtherance of a drug conspiracy (Count Three); and possession of a firearm by a convicted felon (Count Four).  The Presentence Report ("PSR", ECF 745-3) reflected that Counts One and Four were grouped for purposes of calculating the defendant's advisory sentencing guidelines range under the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G.").  *Id.* ¶ 18.  But, Count Three did not group.  *Id.* ¶ 19; *see also* U.S.S.G. § 3D1.2(b).

---

[2] The Docket omits reference to Day 3 of the trial.

For the grouped offenses, defendant had a base offense level of 43, because the PSR applied the murder cross reference under U.S.S.G. § 2A1.1.  ECF 745-3, ¶ 20; *see also* § 2D1.1(c)(2). Four levels were added based on defendant's role in the offense, pursuant to U.S.S.G. § 3B1.1(a). ECF 745-3, ¶ 21.  Obviously, there were no deductions for acceptance of responsibility under § 3E1.1.  *Id*. ¶ 28.  Thus, according to the PSR, Butler had an adjusted offense level of 47 for Counts One and Four.  *Id*. ¶ 32.  But, under the Guidelines, the maximum offense level is 43.

Count One carries a mandatory minimum term of imprisonment of ten years, with a maximum term of life imprisonment.  *See* 21 U.S.C. § 841(b)(1)(a).  And, as to Count Three, Judge Legg was required to impose a mandatory minimum sentence of five years, consecutive, pursuant to 18 U.S.C. § 924(c) and U.S.S.G. § 2K2.4(b).  ECF 745-3, ¶ 37.

According to the PSR, Butler has a long a criminal history.  *Id*. ¶¶ 40-49.  In particular, the defendant had a prior assault conviction in the Circuit Court for Baltimore City for which he received an 8-year sentence (*id*. ¶ 40), and convictions for possession with intent to distribute cocaine, as well as theft and malicious destruction of property.  *Id*. ¶¶ 44, 45.  Moreover, Butler committed the underlying offense while on probation.  *Id.* ¶ 51.  Therefore, two points were added under U.S.S.G. § 4A1.1(d).  Accordingly, Butler's criminal convictions resulted in a criminal history score of nine points.  *Id.* ¶ 53.  This equated to a criminal history category of IV.  *Id.* ¶ 52.

But, Butler was deemed a career offender under U.S.S.G. § 4B1.2(a).  *Id.* ¶¶ 30, 53.[3]  As a result, his criminal history category was increased to VI.  *Id*. ¶ 53.  However, the career offender offense level of 37 was less than the adjusted offense level of 43.  *See id.* ¶ 20.  Therefore, the career offender designation had no impact on defendant's offense level.  *Id.* ¶ 30.

---

[3] As discussed, *infra*, if sentenced today, Butler would not qualify as a career offender.

At Mr. Wright's sentencing on April 28, 2010, Judge Legg observed that Butler "was definitely the mastermind and the leader of the overall conspiracy." ECF 481 (Sentencing Transcript for Wright) at 16. He described Wright as "a clear second-in-command . . . . More of a middle manager in the organization. Butler made all the decisions." *Id.*

Defendant, who was born in 1975, was 34 years old at the time of his sentencing on April 29, 2010. ECF 422; ECF 745-3 at 1. At Butler's sentencing, the government called several witnesses: Detective Michael Collins; Detective James Burger; and the murder victim's wife. *See* ECF 482 (Butler sentencing transcript) at 10-25. And, the government referenced evidence presented at trial. *See*, *e.g.*, *id.* at 35. The Court noted that the issue of the murder cross-reference was "a complicated decision . . . ." *Id.* at 54. But, after reviewing the government's presentation, *id.* at 54-57, the court determined that "there [was] clear and convincing evidence that either Mr. Butler himself murdered Mr. Rodriguez, or that the murder was committed by someone else in the Butler organization and therefore should be attributed to Mr. Butler." *Id.* at 54. Therefore, Judge Legg applied the murder cross-reference and found that "the total offense level is 47, and the Criminal History Category is VI." *Id.* at 57.

In contrast, Judge Legg found the matter of role in the offense "relatively uncomplicated." *Id.* at 53. He applied a four-level increase, based on defendant's leadership role. *Id.*

At sentencing, the government also discussed the murder of Sintia Mesa. ECF 482 at 35-36, 38. Her body was found in January 2007. *See Butler v. State*, No. 2074, Sept. Term 2011, 2015 WL 6111838, at *1 (Md. Ct. Spec. App. Sept. 4, 2015), *cert. denied*, 445 Md. 488, 128 A.3d 52 (2015). Although the crime occurred in 2007, Butler was not convicted until 2011, presumably because of the delay associated with the prosecution of the federal case.

In particular, in 2011, Butler was "convicted in the Circuit Court for Baltimore City of the brutal rape, torture, and murder of Sintia Mesa and he was sentenced to two consecutive life sentences, plus ten years, for those state law crimes." ECF 745 at 2 (citing *Butler gets two life sentences in woman's murder*, BALTIMORE SUN (Nov. 15, 2011), https://www.baltimoresun.com/bs-mtblog-2011-11-butler_gets_two_life_sentences-story.html). Those convictions and sentences were affirmed on appeal.

As noted, Judge Legg sentenced Butler to life imprisonment. ECF 482 at 59. Butler subsequently noted an appeal. ECF 421. The Fourth Circuit affirmed the convictions and sentence on May 18, 2011 (ECF 508), and the mandate issued on July 6, 2011. ECF 524. *See United States v. Butler*, 429 F. App'x 239 (4th Cir.), *cert. denied*, 565 U.S. 1063 (2011).

On November 26, 2012, Butler filed a motion to vacate under 28 U.S.C. § 2255. ECF 564. He also submitted other motions. *See* ECF 569; ECF 582; ECF 585.

Thereafter, in a fifty-five page Memorandum Opinion (ECF 596) and Order (ECF 597) of October 15, 2014, I denied the § 2255 Motion, except with respect to Butler's claim that his lawyer was ineffective in regard to plea negotiations. Therefore, I withheld judgment pending submission of additional information from the government and a possible hearing. *Id.*

Thereafter, the government submitted the affidavit of the former lead prosecutor, George Hazel. ECF 611-1. By that time, however, the prosecutor had become a federal district judge in the District of Maryland.[4] Therefore, on January 16, 2015, I recused myself from further consideration of the case and requested an out-of-district assignment. ECF 612. On February 3, 2015, the remaining portion of Butler's § 2255 motion was transferred to Judge David Faber, who sits in West Virginia. *See* Docket.

---

[4] Judge Hazel has since left the bench and entered private practice.

By Memorandum Opinion and Order of March 30, 2016 (ECF 630, ECF 631), Judge Faber denied Butler's § 2255 motion.  Judge Faber also declined to issue a certificate of appealability.  ECF 630.  The Fourth Circuit dismissed Butler's appeal on October 28, 2016.  ECF 651.  The Mandate issued on December 6, 2016.  ECF 652.

As to the current Motion, defendant has exhausted his remedies.  His request for release, submitted to the Bureau of Prisons ("BOP"), was denied on August 27, 2021.  ECF 756-3.  Indeed, the government does not contest that this case is properly before the Court for a determination on the merits because "Petitioner previously filed an administrative request for compassionate release and home confinement, and that request was denied by the Warden."  ECF 745 at 18.

In his Motion, Butler advances four arguments.  *See* ECF 734.  First, defendant argues that he suffers from asthma, which places him at greater risk of severe illness if he becomes infected with COVID-19.  *Id*. at 1.  Second, he states that he "received a much higher sentence than his more culpable co-defendants for exercising his right to a jury trial."  *Id*. at 1-2.  Third, defendant contends that he "was subject to a higher mandatory minimum sentence than he would have faced had the First Step Act's changes to 21 U.S.C. 802 (57)(A) applied at the time of his sentencing."  *Id*. at 2.  Finally, he notes that he possesses a good record of rehabilitation.  *Id*.

The government acknowledges that "Petitioner's medical conditions potentially confer threshold eligibility . . . ."  ECF 745 at 3.  But, it claims that Butler has not established extraordinary and compelling reasons for compassionate release because he is not exposed to any risk of severe infection from a BOP facility," and "in 2021, the defendant received two doses of Pfizer's COVID-19 vaccine."  *Id*.  Further, the government contends that the Court "should issue a discretionary denial based on the serious nature of Petitioner's conviction [and] his abysmal

6

criminal history . . . ."  ECF 745 at 4.  The government also points out that defendant has served only a small portion of his sentence.  *Id.*

Defendant's medical records confirm that he has been vaccinated against COVID-19.  ECF 745-1.  And, on March 1, 2022, defendant received a booster shot of the Moderna vaccine.  *Id*. Butler is currently serving his sentence at Hazelton FCI.  *See Find an inmate*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last accessed Apr. 20, 2023).   Calculated from his date of arrest on September 11, 2008 (ECF 423), defendant has been incarcerated for approximately 175 months.

Additional facts are included, *infra*.

## II. Appointment of Counsel

Butler asks the Court to appoint counsel for him to assist in litigating the Motion.  ECF 734 at 1.    But, there is no constitutional right to appointed counsel in post-conviction proceedings.  *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("The right to appointed counsel extends to the first appeal of right, and no further.");  *see Hunt v. Nuth*, 57 F.3d 1327, 1340 (4th Cir. 1995).  Rather, the determination to appoint counsel rests within the discretion of the district court.  *See United States v. Legree*, 205 F.3d 724, 730 (4th Cir. 2000) (explaining that a district court has the discretion to appoint defendant counsel under 18 U.S.C. § 3582(c) in exceptional circumstances); *see*, *e.g.*, *Bowman v. White*, 388 F.2d 756, 761 (4th Cir. 1968).

By analogy, a court may appoint counsel to represent a financially eligible petitioner in a § 2255 proceeding where the interests of justice so require.  *Paris v. United States*, 191 F. Supp. 3d 559, 562 (E.D. Va. 2016) (citing 18 U.S.C. § 3006A(a)(2)(B)).   In general, Butler has demonstrated the ability to articulate the legal and factual basis of his claims.  Although he lacked the knowledge to present the issue concerning his career offender designation, the Court has identified and addressed the issue.

A review of Butler's case does not reveal any circumstances that warrant the appointment of counsel at this time. Therefore, I shall deny defendant's request for appointment of counsel, without prejudice.

### III. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson,* 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Congress "broadened" the authority of the courts in 2018, with passage of the First Step Act ("FSA"), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)). *Malone*, 57 F.4th at 173. Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality in regard to a federal sentence. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was first enacted as part of the Sentencing Reform Act of 1984. Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release

had to rely on the BOP Director for relief.  *See Bethea*, 54 F.4th at 831; *see*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

As a result of the enactment of the FSA in December 2018, a federal inmate is now permitted to file a motion for compassionate release directly with the court after exhaustion of administrative remedies.  *See United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). Specifically, pursuant to the 2018 FSA, the Court may reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  *Id.* (emphasis added).

Once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release.  *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  This constituted a sea change in the law.

But, under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only

if two criteria are met.  *Bethea*, 54 F.4th at 831.  In other words, the analysis consists of "two steps."  *Bond*, 56 F.4th at 383.  And, for a court to award compassionate release, it must conclude that the movant satisfies both criteria.  *Bethea*, 54 F. 4th at 831; *see Hargrove*, 30 F.4th at 194-95.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief."  *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021).  If that criteria is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable."  *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[5]  In particular, U.S.S.G. § 1B1.13 provides that on motion by the Director of the BOP, the court may

---

[5] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the Fourth Circuit has recognized, there is no applicable policy statement for a motion filed by a defendant under § 3582(c)(1)(A). *See, e.g.*, *Malone*, 57 F.4th at 174; *McCoy*, 981 F.3d at 276. Of significance here, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the FSA. It is *only* "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Brooker,* 976 F.3d 228, 235-36 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. And,

because there is currently no Sentencing Commission policy statement applicable to a defendant's compassionate release motion, "district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95; *United States v. Brice*, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam).   Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release., U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.  Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.   But, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons.  *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); *see United States v. Gutierrez*, ___ Fed. App'x ___, 2023 WL 245001, at *4 (4th Cir. Jan. 18, 2023) (stating that, in considering motion for compassionate release, district court erred by failing to address defendant's evidence of rehabilitation).   Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).  Moreover, "[i]n deciding a motion for compassionate release, the district court is confined to the evidence

presented." *Bethea*, 54 F.4th at 833 n.2; *see also United States v. Osman*, 2022 WL 485183, at *1 (4th Cir. Feb. 17, 2022).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169. However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022. In that case, the Supreme Court said, in the context of § 404(b) of the First Step Act, that "a district court cannot . . . recalculate a movant's benchmark Guidelines range in any way other than to reflect the retroactive application of the Fair Sentencing Act [of 2010] . . . ." *Id.* at 2402 n.6. The Court explained that the "Guidelines range 'anchor[s]' the sentencing proceeding . . . . The district court may then consider postsentencing conduct or nonretroactive changes . . . with the properly calculated Guidelines range as the benchmark." *Id.* (first alteration in original; internal citation omitted); *see also United States v. Troy*, 64 F.4th 177, 183-84 (4th Cir. 2023).

To be sure, the district court is obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion*, 142 S. Ct. at 2396; *Troy,* 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *Brice*, 2022 WL 3715086, at *2. However, such changes do not warrant a recalculation of the Guidelines. *Troy*, 64 F.4th at 184.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020). And,

compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at \*2-3 (W.D. N.C. Mar. 16, 2020).

As explained, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, that does not end the inquiry.  The second step requires the court to consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *United States v. Mangarella*, 57 F.4th 197, 200, 203 (4th Cir. 2023); *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at \*1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at \*2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

Notably, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a

motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167.  And, "'the record as a whole'" must demonstrate that the judge considered the parties' contention, and had "'a reasoned basis'" for the exercise of his or her discretion.  *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

Moreover, where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments."  *Mangarella*, 57 F.4th at 203; *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n. 3.  That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case."  *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).

Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion."  *Bethea*, 54 F.4th at 834; *see Gutierrez*, 2023 WL 245001, at *5; *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189.  Moreover, "the district court is less likely to have abused its discretion if it considered arguments in opposition to its ultimate decision."  *Bethea*, 54 F.4th at 834; *see also High*, 997 F.3d at 189; *Kibble*, 992 F.3d at 332.

As the Fourth Circuit has observed "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'"  *Bond*, 56 F.4th at 384 (quoting *United States v. Jackson*, 952

F.3d 492, 500 (4th Cir. 2020)).  And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain.  *Bond*, 56 F.4th at 384-85.

In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case."  *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190). And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'"  *Cohen*, 2022 WL 2314302, at *1 (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  In doing so, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling."  *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

### IV. COVID-19[6]

### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[7]  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic.  *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19),* TRUMP WHITE HOUSE (Mar. 13, 2020), https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-

---

[6] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[7] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.    That declaration was

extended on several occasions.  *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

COVID-19 spawned "a public health crisis more severe than any seen for a hundred years."

*Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd*

*in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).  People who

are stricken with the coronavirus sometimes experience only mild or moderate symptoms.  But,

particularly at the outset of the pandemic, the virus could cause severe medical problems as well

as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F.

Supp. 3d at 223 (citation omitted).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths,

according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first

cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S.*

*COVID deaths after losing political battles*, Reuters (May 12, 2022),

https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/.

And, as of March 10, 2023, this number rose to 1,123,836.  *See COVID-19 Dashboard*, The Johns

Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Apr. 20, 2023).

Johns Hopkins University ceased the collection of COVID-19 data as of March 10, 2023.

But, it reports that, as of that date, COVID-19 had infected more than 103.8 million Americans.

*Id*.

The judges of this Court "have written extensively about the pandemic."  *United States v.*

*Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).

Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the

pandemic.  *Id.*  That said, the Court must reiterate that the COVID-19 pandemic has been described

as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In February 2023, the CDC updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (February 10, 2023), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease;

obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://www.cdc.gov/aging/covid19/index.html. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196. Nevertheless, the court may consider the CDC's guidelines. *Bethea*, 54 F.4th at 832; *United States v. Petway*, 2022 WL 168577, at *3 (4th Cir. Jan. 19, 2022) (per curiam). And, "the inquiry should consider whether the underlying condition places the inmate at an increased risk of severe illness from Covid-19." *Bethea*, 54 F.4th at 832.

**B.**

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://bit.ly/3dPA8Ba (last accessed Apr. 20, 2023). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg.*

*Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease.

Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[8]

---

[8] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

### C.

Unfortunately, there is no cure for the coronavirus.  But, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.  Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.

On March 29, 2022, federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.  Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna for people ages 18 years and older.  *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the initial vaccine rollout, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF

PRISONS           CLINICAL           GUIDANCE           (Jan.           4,           2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. It provided that administration of the COVID-19 vaccine (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6. The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. Much has changed since that time.

As of April 19, 2023, the BOP had 145,196 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 349,798 vaccine doses to staff and inmates. *See* BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last updated Apr. 19, 2023).

Also, as of April 2023, approximately 69% of the total U.S. population has completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up. *See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-people-fully-percent-pop5 (last updated Apr. 12, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://covid.cdc.gov/covid-data-tracker/#vaccination-demographics-trends (last updated Apr. 12, 2023); Moreover, approximately 54.5 million Americans have received a third or "booster"

vaccine dose, which the CDC recommends for all persons age 5 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Apr. 13, 2023).

**D.**

The number of COVID-19 cases continues to fluctuate.  For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants");  *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, sparking concern because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html. But, the number of COVID-19 cases again declined. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y. And, the country began to return to normalcy.

Unfortunately, we then experienced another surge in COVID-19 cases. *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html. In particular, in the spring of 2022 a new variant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ." *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases. As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants." Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/. But, the variant then seemed to

subside.  *See COVID Data Tracker: Variant Proportions*, CTRS. FOR DISEASE CONTROL &
PREVENTION, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last updated Apr. 15,
2023).

At this point, COVID-19 has, in a sense, become a fact of life.  *See* Mitch Smith and Julie
Bosman, *Covid Deaths Surge Across a Weary America as a Once-Hopeful Summer Ends*, N.Y.
TIMES, Sept. 5, 2021,  https://www.nytimes.com/2021/09/05/us/covid-surge-united-states.html
("[T]he coronavirus is going to remain a fact of American life for the foreseeable future.").  In
other words, we are in "a more endemic phase of this crisis . . . ."  *See* District of Maryland
Standing Order 2022-05, Misc. No. 00-308 (filed Dec. 14, 2022).  Indeed, in an interview in
September 2022 on the CBS television show "60 Minutes", President Biden claimed that the
pandemic is "over" in the United States.  Alexander Tin, *Biden says Covid-19 pandemic is "over"
in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over.  We still have a problem
with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over."  *Id.*  Indeed, as
noted, Johns Hopkins University has ceased collecting COVID-19 data.  *See COVID-19
Dashboard, supra,* https://bit.ly/2WD4XU9.

Moreover, on February 10, 2023, President Biden provided notice of his intent to terminate
the COVID-19 national emergency, effective May 11, 2023.  *Termination of COVID-19 National
Emergency*, ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS (Apr. 3, 2023).  And,
Congress has passed a joint resolution (H.J. Res. 7) seeking to end the national emergency, perhaps
earlier than May 11, 2023.  *Id.*

In any event, it appears that "virus metrics have stabilized."  Standing Order 2022-05.  And,
as Chief Judge Bredar of this Court has noted, in consultation with this court's epidemiologist, the
virus patterns have changed, with the virus's severity decreasing as "the population has gained

some level of immunity from vaccinations and prior infections." *Id.* Put another way, the coronavirus may be here to stay, but the acute nature of the crisis has certainly abated.

With respect to the BOP, it has reported that, as of April 19, 2023, 185 federal inmates, out of a total population of 145,196, and 28 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19. Moreover, 44,375 inmates and 15,269 staff have recovered from the COVID-19 virus. In addition, 316 inmates and seven staff members have died from the virus. The BOP has completed 128,646 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to Hazelton FCI, where the defendant is imprisoned, the BOP reported that as of April 20, 2023, out of a total of 2,103 inmates, zero inmates and zero staff members currently test positive, three inmates and zero staff members have died of COVID-19, and 142 inmates and 125 staff have recovered at the facility. In addition, 487 staff members and 3,420 inmates have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/; BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/mck/ (last accessed Apr. 20, 2023).

## V. Discussion

Butler has moved for compassionate release on several grounds.

To start, defendant contends that his asthma renders him particularly vulnerable to COVID-19. ECF 734 at 1. He describes his asthma as moderate to severe. ECF 756 at 2. In addition, he complains of untreated mental health problems. *Id.*

Moreover, Butler maintains that he "has diligently applied himself to rehabilitation." *Id.* at 1. He points to "over 450 programming hours . . . ." *Id.* In support of his claim, Butler has attached his Inmate Education Data Transcript (ECF 756-1), as well as his Recidivism Risk Assessment (ECF 756-2).

Further, defendant complains about the "harsh conditions" in prison, which allegedly injure defendant's "physical and mental health."  ECF 756 at 2.  And, Butler complains about inadequate medical care.  *Id.*  Butler also characterizes his life sentence as "draconian . . . ."  *Id.* at 3. Furthermore, he seeks to relitigate Count Four, stating that the jury "was never instructed that the government must prove, or that the jury must find, that [he] knew he was in a category of persons prohibited from possessing a firearm."  *Id.*

**A.**

In regard to defendant's asthma, the government notes that Butler's medical records indicate that his asthma is "'resolved,' and it is not listed as a 'current' health condition."  ECF 745 at 18 (quoting ECF 745-2 at 11).  And, the government points out that defendant has been vaccinated as to COVID-19.  ECF 745-2 at 25.

The CDC is clear that people with "moderate-to-severe or uncontrolled asthma are more likely to be hospitalized from COVID-19."  *People with Moderate to Severe Asthma*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last updated Apr. 7, 2022).  But, there is no evidence that defendant suffered from moderate to severe asthma.  For example, the record does not reflect that he suffers from symptoms that require use of an Albuterol inhaler on a daily basis.  Nor does the record reflect limitations of normal activities.  Indeed, Butler's asthma appears to be resolved.  ECF 745-2 at 11.  Thus, on its own, the condition would not support a finding of extraordinary and compelling reasons for compassionate release.

Even if defendant has moderate to severe asthma, rulings as to asthma as an extraordinary and compelling reason are mixed.  Judge Grimm of this Court has noted: "This Court and others have found that the standard of extraordinary and compelling reasons was met during the COVID-

19 pandemic where a defendant had a risk of serious complications from COVID-19 based on asthma and other medical conditions. . . .   In some cases, this Court and others have found that mild asthma alone did not a [sic] constitute extraordinary and compelling reasons for release." *United States v. Jennings*, PWG-13-046, 2020 WL 4748462, at *4 (D. Md. Aug. 17, 2020) (collecting cases).

Similarly, another court has remarked: "Because the CDC lists moderate to severe asthma as a condition that can increase the risk of severe illness caused by COVID-19, many courts have distinguished between petitioners with mild/moderate asthma to severe asthma when deciding whether the condition constitutes a compelling and extraordinary circumstance justifying compassionate release. . . .   Moderate asthma occurs 'where the individual suffers from daily symptoms, experiences nighttime awakenings more than once a week, uses an Albuterol rescue inhaler on a daily basis, and experiences some limitation of normal activities.'"  *United States v. Garcia*, 538 F. Supp. 3d 226, 229 (D. Mass. 2021) (internal citations omitted).  *See also, e.g.*, *United States v. Bright*, JAH-17-270, 2022 WL 16951832, at *2-3 (S.D. Cal. Nov. 15, 2022) (concluding that defendant's adequately treated asthma did not constitute an extraordinary and compelling reason to grant compassionate release); *United States v. Armstrong*, RDB-19-357, 2021 WL 2806226, at *3 (D. Md. July 6, 2021) (citing CDC guidance, declining to find extraordinary and compelling reasons based on asthma adequately managed by prescriptions); *United States v. Malone*, CCB-13-307, 2021 WL 252559, at *1 (D. Md. Jan. 26, 2021) (asthma alone not sufficient grounds for compassionate release); *United States v. Daniels*, Crim. No. 15-127, 2020 WL 4674125, at *3 (E.D. Pa. Aug. 12, 2020) (recognizing that moderate to severe asthma could constitute an extraordinary and compelling reason for compassionate release, but

concluding it was not warranted based on medical records indicating asthma is under control; defendant was instructed to use Albuterol only to prevent asthma attack, but not daily).

Regardless, the Court does not accept the government's argument that a defendant's vaccination "precludes eligibility for compassionate release." ECF 745 at 19. Without question, the COVID-19 vaccines have been useful in reducing the health risks posed by the coronavirus. But, they are certainly not a panacea. "The variants have shown a remarkable ability to get around the protection offered by infection and vaccination." Carla K. Johnson, *Experts decry little action as COVID-19 cases surge*, Balt. Sun (July 14, 2022).

Moreover, as illustrated above, the future trajectory of the COVID-19 pandemic is anything but predictable. As Judge Grimm said in *United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021): "It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."

The CDC has confirmed that breakthrough infections of COVID-19 occur even among vaccinated individuals and, albeit in rare cases, they can result in death. *See Rates of COVID-19 Cases and Death by Vaccination Status*, Ctrs. for Disease Control & Prevention, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed Apr. 20, 2023). An analysis of "nationwide data from the Center for Disease Control and Prevention" revealed that "[t]he vaccinated made up 42 percent of fatalities in January and February [of 2022,] during the highly contagious omicron variant's surge, compared with 23 percent of the dead in September, the peak of the delta wave." Fenit Nirappil & Dan Keating, *Covid deaths no longer overwhelmingly among the unvaccinated as toll on elderly grows*, Wash.

Post (Apr. 29, 2022), https://www.washingtonpost.com/health/2022/04/29/covid-deaths-unvaccinated-boosters/.

Further, several judges of this Court have concluded that an inmate is eligible for compassionate release, notwithstanding vaccination status. *See e.g.*, *United States v. Hegie*, RDB-14-411, 2022 WL 605383, at *2 (D. Md. Mar. 1, 2022) (finding that, in light of the COVID-19 pandemic, a fully vaccinated defendant who suffered from obesity and asthma presented an extraordinary and compelling reason for his release); *United States v. Coleman*, PWG-17-393, WL 356724, at *3 (D. Md. Feb. 7, 2022) (determining that, in light of the dynamic nature of the COVID-19 pandemic and the absence of any information concerning the inmate's vaccination status, defendant's underlying medical conditions qualified as an extraordinary and compelling reason for his release); *United States v. Rivas*, TDC-19-0417, 2022 WL 36941, at *2 (D. Md. Jan. 4, 2022) (explaining that vaccinated defendant who was a paraplegic and suffered from frequent urinary tract infections could satisfy the extraordinary and compelling prong of the analysis). "At the end of the day, district judges are not epidemiologists." *United States v. Sherrod*, 19-20139, 2021 WL 3473236, at *5 (E.D. Mich. Aug. 6, 2021).

Nonetheless, to the extent that Butler relies on COVID-19 as a basis for his release, he must establish some ground, such as a qualifying medical condition, to demonstrate that he is particularly susceptible to COVID-19 and thus eligible for compassionate release. And, as discussed, defendant appears to be in relatively good health.

Further, the fear of COVID-19 does not constitute an extraordinary and compelling circumstance that warrants an inmate's release. Judge Chasanow of this Court has explained: "While all share the concern of the public health challenges caused by COVID-19, and appreciate the heightened anxiety experienced by those incarcerated in correctional facilities . . . , generalized

and unspecific reasons . . . do not satisfy the standard for compassionate release." *United States v. Harris*, DKC-08-319, 2020 WL 2512420, at *1 (D. Md. May 15, 2020).  Accordingly, Butler has failed to establish extraordinary and compelling circumstances for his release based on vulnerability to the coronavirus.

**B.**

Defendant seeks a reduction of his life sentence because, in his view, it is "draconian."  A defendant's extremely lengthy sentence may qualify as an extraordinary and compelling reason for compassionate release.  *See McCoy*, 981 F.3d at 286 ("[T]he district courts permissibly treated as 'extraordinary and compelling reasons' for compassionate release the severity of the defendants' [] sentences[.]"); *see also Untied States v. Kratsas*, DKC-92-0208, 2021 WL 242501, at *4 (D. Md. Jan. 25, 2021).  However, there is no merit to Butler's argument that he was "subject to a higher mandatory minimum sentence than he would have faced had the First Step Act's changes to 21 U.S.C. 802 (57)(A) applied at the time of his sentencing."  ECF 734 at 2.  As the government notes, "21 U.S.C. § 802 (57)(a) pertains to the definition of 'serious drug felony' and refers to the length of the sentence imposed."  ECF 745 at 26-27.  But, defendant's Guidelines were not enhanced as a result of "serious drug felony convictions."  *See* ECF 745-3, ¶¶ 39-53.  Rather, as discussed, Butler's offense level was founded on the application of the murder cross reference and an enhancement for defendant's role in the offense.

As noted, defendant was found to be a career offender under U.S.S.G. § 4B1.1(a).  That provision states: "A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and

(3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense."

Although neither party addressed the issue, the Court notes that, if Butler were sentenced today, Butler would not qualify as a career offender under U.S.S.G. § 4B1.1(a).  This is for two reasons.

First, defendant's Maryland assault conviction, which was one of the predicate offenses, no longer qualifies as a crime of violence, and thus is not a proper predicate.  *United States v. Royal*, 731 F.3d 333, 342 (4th Cir. 2013).  Moreover, Butler's underlying conviction for conspiracy to distribute heroin and cocaine categorically no longer qualifies as a "controlled substance offense."  *United States v. Norman*, 935 F.3d 232, 239 (4th Cir. 2019).

As noted, the defendant's career offender designation resulted in an offense level of 37.  That was less than the defendant's actual offense level of 47.  ECF 745-3, ¶ 29.[9]  Therefore, the career offender offense level was not used for determination of the offense level.  *Id.* ¶ 30.

To be sure, the career offender designation resulted in an increase in Butler's criminal history category, from IV to VI.  However, with an offense level of 43 – the highest offense level under the Guidelines – the Guidelines call for a sentence of life imprisonment, regardless of the criminal history category.

Furthermore, there is no indication that the designation of career offender influenced Judge Legg in any way in his decision to impose a life sentence.  Accordingly, under the circumstances of this case, defendant's career offender designation does not qualify as an extraordinary and compelling reason for compassionate release.

---

[9] As noted, the highest level under the Guidelines is actually 43.

Moreover, Butler's argument about his conditions of confinement does not establish a stand-alone reason for compassionate release.  To the extent that courts have considered such arguments, they have found that the "harsh conditions of imprisonment occasioned by the COVID-19 pandemic are not, without more, sufficiently extraordinary and compelling to warrant compassionate release."  *United States v. Hall*, JKB-04-0323, 2022 WL 2105975, at *3 (D. Md. June 10, 2022) (internal quotations and citation omitted).

Butler argues that he is subject to "harsh and restrictive conditions of confinement during the pandemic that were known to medical personnel to be ineffective and that denied adequate access to medical care, mental health services, and programming."  ECF 756 at 2.  Defendant's challenges do not, without more, establish extraordinary and compelling reasons for compassionate release.

Furthermore, "[c]laims that prison officials failed to provide adequate medical care to an inmate . . . sound in the Eighth Amendment."  *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (citation omitted).  While Butler "could seek relief for this alleged constitutional violation in an appropriate [civil] lawsuit, '[a] motion for compassionate release is not the proper vehicle for an Eighth Amendment claim, and the Eighth Amendment protections and standards are not applicable to the compassionate release analysis under Section 3582(c).'"  *United States v. Langford*, JKB-15-0539, 2022 WL 1443868, at *3 n.3 (D. Md. May 6, 2022) (quoting *United States v. Wiley*, FDW-03-0205, 2021 WL 1234595, at *1 n.1 (W.D.N.C. Apr. 1, 2021)); *see also United States v. Akers*, KHV-4-20089-1, 2022 WL 2438388, at *4 (D. Kan. July 5, 2022) ("Claims which assert potential constitutional violations should be brought—if at all—in a separate civil action, not as part of a motion for compassionate release.").

**C.**

Even assuming, *arguendo*, that Butler has demonstrated extraordinary and compelling circumstances for compassionate release, an analysis of the § 3553(a) factors does not support the granting of his Motion.

The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.). Even when a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam). These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *High*, 997 F.3d at 186.

The government argues that Butler is a danger to the community, citing, *inter alia*, the seriousness of his offense and his criminal history. ECF 745 at 23-37. There is no doubt that defendant's crime was a serious one. In addition to finding that Butler was the leader of the drug conspiracy, ECF 482 at 53, Judge Legg noted that his "drug organization was characterized by guns and potential violence." *Id.* at 56. Moreover, he found, by a preponderance of the evidence that the defendant caused the death of another. *Id.* at 54. Furthermore, Butler has a significant criminal history. ECF 745-3, ¶¶ 40-49. And, defendant committed the crimes at issue while on parole for a felony drug offense committed in 2013. *Id.* ¶ 51.

As mentioned, Judge Legg applied the murder cross reference because of the killing of Rodriguez.  But, that is not the only murder attributed to defendant.

On October 19, 2009, a grand jury in the Circuit Court for Baltimore City indicted Butler, along with Wright, for first degree murder, conspiracy to commit first degree murder, and other crimes related to the death of Sintia Mesa.   *Butler v. State of Maryland*, No. 2074 Sept. Term 2011, 2015 WL 6111838, at *1 (Md. Ct. Spec. App. Sept. 4, 2015), *cert. denied*, 445 Md. 488, 128 A.3d 52 (2015).  After a six-day trial, a jury convicted Butler of first degree murder, conspiracy to commit murder, and third degree sexual offense.  *Id*.  Butler was sentenced to life imprisonment for first degree murder, a consecutive life sentence for conspiracy to murder, and a ten-year consecutive sentence for the third degree sexual offense conviction.  *Id*.  These crimes, in which Butler demonstrated an utter disregard for human life, occurred before Butler's conviction in this case, even though the actual conviction occurred afterwards.

Moreover, Butler opted for trial in this case.  He has not been punished for exercising that sacred right.  But, his decision foreclosed the award of deductions to his offense level for acceptance of responsibility, which was earned by most of his codefendants.  The government is entitled to reward a defendant who accepts responsibility for criminal conduct and/or who spares the system the burden of a trial.  So, there are sound reasons to explain why Butler received a sentence that exceeded the sentences of his codefendants.

The Court is aware of the view that when the government seeks a lengthy sentence, it appears to constitute punishment of the defendant for the exercise of his right to proceed to trial. *See*, *e.g.*, *United States v. Sessoms*, 656 F. Supp. 3d 325, 329 (E.D.N.Y. 2021) (finding extraordinary and compelling circumstances, in part, because defendant received harsher sentences than other defendants who did not go to trial); *United States v. Cabrera*, 531 F. Supp. 3d 863, 868

(S.D.N.Y. 2021) (Rakoff, J.) (in granting compassionate release motion, criticizing "the corrosive effects of the trial penalty," and "refus[ing] to punish a defendant for his choice to exercise his constitutional rights"); *United States v. Cano*, No. 95-00481-CR, 2020 WL 7415833, at *6 (S.D. Fla. 2020) (granting compassionate release in part based on disparity in sentences between defendant and codefendant who pleaded guilty).  As to this case, I do not share that view.  The facts warranted the lengthy sentence.

To be sure, Butler's behavior while in BOP custody is an important indicator of whether he remains a danger to the community.  *See* 18 U.S.C. § 3582(c)(1)(A)(ii).  In his Motion, Butler states that "he has shown his rehabilitation By [sic] working, Programing, and never receiving an incident report."  ECF 734 3-4.  However, Buter's Recidivism Risk Assessment indicates that he has received at least one incident report.  ECF 756-2.  Regardless, "rehabilitation alone cannot serve as a basis for compassionate release."  *Davis*, 2022 WL 127900, at *1.

Defendant has only been incarcerated since September 11, 2008.  ECF 745-3 at 1; ECF 60.  A reduction of defendant's sentence would not promote respect for the law.  And, in my view, the remaining sentencing factors set forth in 18 U.S.C. § 3553(a) also militate against defendant's release at this time.

## VI. Conclusion

Even if Butler is eligible for compassionate release, a reduction of sentence is not warranted at this time, in light of the factors set forth in 18 U.S.C. § 3553(a).  In sum, the Court remains troubled by the serious nature of defendant's offenses of conviction and his serious criminal history, reflecting his repeated failure to conform his conduct to societal expectations.

Simply put, this is not the "grievous case[]" warranting compassionate relief.  *McCoy*, 981 F.3d at 287.  A reduction in the length of the sentence would not adequately reflect the seriousness

of the defendant's crimes nor promote respect for the rule of law.  Consequently, and for the reasons set forth above, the Court denies the Motion, without prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date: May 2, 2023                                      _____/s/_____
                                                       Ellen L.  Hollander
                                                       United States District Judge